**Marvin BIEGHLER, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 1183S409.

Supreme Court of Indiana.

July 31, 1985.

Rehearing Denied Sept. 26, 1985.

**80** 

Bruce M. Frey, Marion, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Marvin Bieghler was found guilty by a jury in Howard Superior Court of two counts of intentional murder and one count of burglary. The jury moreover recommended that the death sentence be imposed on both counts of murder. The trial judge found that the jury had properly and lawfully found the death sentence appropriate and accepted the jury's recommendation. The trial judge then imposed the death sentence on Appellant Bieghler. The trial judge did not sentence Bieghler on the burglary conviction.

The facts adduced during Appellant's trial show that at approximately 10:30 a.m. on December 11, 1981, Kenny Miller went to the trailer near Kokomo occupied by his brother, twenty-one year old Tommy Miller, and sister-in-law, nineteen year old Kimberly Miller, and found both of them dead. Kimberly, pregnant with child, was lying in the doorway to their bedroom and Tommy was lying dead at the end of the bed. The evidence also showed that Tommy Miller sold drugs for Appellant and Appellant admitted he was in the business of buying drugs in Florida and selling them in the Kokomo area. One of Appellant's constant companions was his bodyguard, Harold "Scotty" Brook. Brook testified, as did others, that someone had informed the police and caused the arrest of one of Appellant's chief operatives thereby causing the confiscation of a large amount of his marijuana. The expression in the drug culture for informing or "snitching" on an operation is "dropping a dime." Appellant had many times made the statement that if he ever discovered who "dropped a dime" on him, he would "blow him away." It developed that Tommy Miller became suspect as the one who had informed and Appellant many times stated to Brook and other people that he was going to get Miller. Appellant was known to carry an automatic pistol described as a "super .38." On the evening of December 10, 1981, Brook testified that he and Appellant smoked marijua-

na and drank alcoholic beverages. During this evening, Appellant spoke of getting Tommy Miller. Finally, at around 11:00 p.m., Appellant said, "Let's go," and he and Brook went out to Appellant's automobile. Appellant drove to the neighborhood of Miller's trailer where Brook said he tried to stop Appellant but could not hold him back. Appellant went to the trailer, opened the door and walked to the bedroom door with his pistol in his hand. Brook's testimony equivocated as to whether or not he heard any shots at this time. At one time, he told the police he did hear shots but at another time, and on the witness stand, he said he did not hear any shots. It is not clear whether Brook says none were fired or just that he didn't hear them. Notwithstanding, Brook said that the gun in Appellant's hand was leveled at something in the room and he saw the baby's face with an expression which suggested the baby was crying but he did not hear any cries. Appellant then came out of the room smiling and rushed from the trailer. Appellant later was distraught and crying and said he had to leave town immediately. He very shortly left for Florida. Eighteen issues are alleged and presented for our review in this direct appeal as follows:

1. insufficiency of the evidence;

2. failure of Indiana's capital punishment scheme to require written findings by the jury;

3. improper jury selection;

4. denial of Appellant's motion for an increased number of peremptory jury challenges;

5. exclusion of the coroner's testimony as to time of death;

6. improper evidentiary rulings;

7. prosecutorial misconduct;

8. improper cross-examination of Appellant;

9. granting of a motion *in limine* concerning testimony of witness Brook;

10. failure to bring Appellant to trial within 120 days of his extradition;

11. improper discovery by State;

12. improper vesting of power in the prosecutor to elect who should receive the death penalty;

13. improper guidelines for the sentencing trial judge;

14. no meaningful and sufficient appellate review afforded one receiving the death penalty;

15. improper scheme by which death penalties can be initiated by information rather than indictment;

16. denial of Appellant's motion to re-*voir dire* the jury between the guilt and penalty phases of his trial;

17. modification of Appellant's tendered instruction No. 30 and trial court's refusal to give certain other instructions tendered by Appellant; and

18. incompetency of counsel.

I

Appellant first claims that the State's evidence was insufficient to convict him in that the State failed to prove that the alleged crimes occurred during the period of time specified in the State's response to his notice of alibi. The State's response indicated that it intended to prove Appellant committed the alleged crimes between 10:30 p.m. and 1:00 a.m. during the night of December 10–11, 1981. Appellant's argument is based on the fact that there apparently is a conflict of evidence regarding the time these crimes occurred. In a sufficiency question, of course, this Court will not reweigh the evidence nor judge the credibility of witnesses. We consider only that evidence most favorable to the State together with all reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact, even though there is some conflict in that testimony, the verdict will not be overturned. *Fielden v. State*, (1982) Ind., 437 N.E.2d 986. This is because the resolution of conflicts in the evidence is within the province of the jury.

Brook testified that he spent the evening with Appellant, leaving a tavern

around 11:00 p.m. He stated that after Appellant murdered the Millers, they picked up Appellant's girlfriend, Thelma McVety, from her work by 11:15 p.m. McVety said she left her work area at a few minutes after 11:00 p.m. expecting to be immediately picked up by Appellant. There was testimony from McVety and a co-worker that McVety became upset because Appellant was late. McVety testified that she was picked up by Appellant between 11:15 and 11:20 p.m. Fay Nova, Tommy Miller's mother, testified that she talked to Miller at about 11:20 p.m. Appellant's argument is that considering the testimony of Nova and McVety, Tommy Miller would still have been alive after the time that Brook said he and Appellant were at the trailer. Therefore, Appellant's argument follows, Brook's testimony that Appellant murdered the Millers shortly after 11:00 p.m. cannot be believed. An examination of all of the testimony of these witnesses, however, shows that none of them testified with any particular accuracy. Instead, each spoke generally of the time sequences involved but did not indicate that they looked at a watch or compared the time with that of some other incident which would exactly fix the time of each event. Whatever the case, the variance of time suggested by the testimonies of all of these witnesses amounts to no more than fifteen or twenty minutes. The jury could reasonably find that none of the witnesses was testifying about an exact minute and thereby could have resolved all of their testimony in that manner. This alleged conflict therefore does not amount to insufficiency of the evidence warranting reversal but rather amounts to a minor conflict in the evidence that we will not disturb on appeal.

■ Appellant further claims insufficiency of the evidence with regard to the only eyewitness, Scotty Brook. Appellant first attacks Brook's testimony as lacking credibility due to his character and his testimony that he was drinking alcohol and ingesting marijuana on the night in question. Questions about the character or sobriety of a witness, of course, go to the weight of that witness' testimony and not to its admissibility. Only when certain testimony is inherently improbable or coerced, equivocal, wholly uncorroborated, or of incredible dubiosity, will the appellate court impinge on the jury's prerogative of decision. *Rodgers v. State*, (1981) Ind., 422 N.E.2d 1211. No such inherent improbability appears in Brook's testimony.

■ Appellant also claims that Brook's testimony does no more than show that Appellant was present at the victims' trailer and had an opportunity to commit these crimes. He cites us to *Glover v. State*, (1970) 253 Ind. 536, 255 N.E.2d 657 [Justices Givan and Arterburn dissenting] and *Manlove v. State*, (1968) 250 Ind. 70, 232 N.E.2d 874, *reh. denied* 250 Ind. 70, 235 N.E.2d 62. In *Manlove*, the defendant and the deceased were seen together in public leaving a tavern and the deceased subsequently was found dead in a canal about twelve hours later. There was no evidence that the defendant was near the canal or at the scene of the crime during the time of its commission and the evidence therefore was found insufficient. In *Glover*, the evidence showed only that the defendant was in the general area of the crime: on a public street near a crowded tavern and on a natural route to the parking lot. Some scuffle had been witnessed between the defendant and the deceased earlier but no one put him at the actual scene of the crime. The court accordingly found no evidence from which a reasonable jury could infer that the defendant stabbed the victim and therefore reversed the conviction. In this case, however, Brook testified that he accompanied Appellant to the trailer with Appellant stating his intent to kill Miller. When the bodies were found the next morning at 10:30, some *rigor mortis* had set in indicating the victims had been dead for some time although the pathologist, Dr. Pless, said it was impossible to determine the exact time of death. Brook testified that Appellant had with him at the crime scene his super .38 caliber pistol. Shell casings found at the scene were of the super .38 variety as were the slugs found in the bodies of the victims and in the

woodwork of the room. Brook's only equivocation was that he did not hear any shots. He did not explain whether he meant no shots were fired or whether he just didn't hear them. His description of the scene indicated that Appellant fired his pistol but Brook said he could not recall hearing sounds, including the baby crying. A dime was found near the body of each victim which was considered significant since Appellant was known to talk about someone "dropping a dime" on him. Appellant told Brook and many others that he intended to "blow [Miller] away" and also told Brook when they headed toward the trailer that he was going to do it then. His subsequent actions in being distraught and in immediately leaving the area further confirmed this. Brook's testimony therefore did more than simply place Appellant at or near the scene of the crime. Accordingly, we find sufficient evidence from which the jury could reasonably determine that Appellant intentionally killed both of the Millers.

■ Appellant further claims that there was not sufficient evidence to find him guilty of burglary. Ind.Code § 35–43–2–1 (Burns 1985) dictates that to prove a burglary requires the showing of a breaking and entering of the building or structure of another person with intent to commit a felony therein. The evidence above clearly establishes that Appellant entered the Millers' trailer with an intent to kill the Millers. There need not be a showing of actual fracturing or of some physical damage to an entryway in order for there to be an illegal entry. Brook testified that Appellant put his hand in his jacket pocket and gripped the doorknob through his jacket so as not to leave fingerprints. He then simply turned the knob and opened the door, indicating that the door was not locked. This was sufficient to prove a breaking and entering. *Willard v. State*, (1980) 272 Ind. 589, 400 N.E.2d 151.

## II

■ Appellant next contends that the lack of a requirement that the jury must enter written findings to justify their death recommendation precludes a finding that they had sufficient reason to do so and prevents this Court from adequately reviewing the imposition of the death penalty. There is no authority, however, for the proposition that juries who make recommendations to judges who then make the ultimate sentencing decision need make written findings so long as the trial judge submits written findings adequate for review particularly where, as in our statutes, the trial judge operates as the ultimate sentencer rather than simply as a reviewer of the jury's recommendation. The trial judge is the only authority allowed by statute to determine the proper penalty which he or she does according to the standards prescribed by the statute. The trial judge in sentencing must adhere to a high degree of specificity and must take care that the requisite written reasons for the imposition of a sentence recite the actual facts relating to the character of the offense and of the offender. *Schiro v. State*, (1983) Ind., 451 N.E.2d 1047, *cert. denied*, —— U.S. ——, 104 S.Ct. 510, 78 L.Ed.2d 699. The United States Supreme Court has approved a Florida death sentencing procedure which does not require the jury to adhere to the "beyond a reasonable doubt" standard in finding aggravating circumstance. *Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913. Our statute, of course, requires the jury to find the aggravating circumstance beyond a reasonable doubt while weighing mitigating circumstances. This Court previously has concluded that our statutory procedure satisfies all requirements for written findings announced by the U.S. Supreme Court in order to provide for a meaningful appellate review by demanding such findings from the judge. *Brewer v. State*, (1981) 275 Ind. 338, 417 N.E.2d 889, *cert. denied*, (1982) 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384; *Judy v. State*, (1981) 275 Ind. 145, 416 N.E.2d 95. That procedure was followed in the instant case and we accordingly find no merit to Appellant's contention.

## III

■ Appellant contends the trial court failed to apply the proper standard for excluding prospective jurors from the final panel. Specifically, Appellant refers to the practice of asking *voir dire* questions to potential jurors to determine which of them are unable to fairly consider death as a proper penalty for any crime. In *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, the United States Supreme Court set the standards for such inquiry and allowed the exclusion of jurors for cause who actually stated "that they would not even consider returning a verdict of death." In other words, a prospective juror must be unequivocally opposed to the death penalty such that he or she would not be able, under any circumstances, to vote for the death penalty regardless of the strength of the evidence showing its propriety. Mere disagreement with the death penalty, however, or conscientious scruples or even feelings that one would find it almost impossible to vote for death, are not sufficient to exclude a juror for this cause. *Witherspoon, supra.* Such exclusion requires that the trial court determine that a juror's true stand, without equivocation and without self-contradiction, is that he would not vote for death in any case. *Lamar v. State,* (1977) 266 Ind. 689, 366 N.E.2d 652, *reh. denied.*

■ After some discussion with the prosecutor as to what form of execution is used in Indiana and after an indication that he was against the death penalty, Juror Faulkner was asked by the trial court: "[W]ould there be any circumstances at all that you would vote for the death penalty?" Faulkner's answer was "No." Juror Steward was questioned about other things in addition to the death penalty. She said she didn't know whether or not she could consider a death penalty and the trial court refused to excuse her. The questioning of Juror Steward then continued and she was asked about burden of proof and presumption of innocence. She appeared not to understand the presumption and burden of proof issues. She also said that she would

not know what she would do as a juror until she did it but she believed the defendant should have to testify and she did not know if she could follow the court's instruction to ignore the fact that he did not testify. When asked if she could sit on the jury without prejudice and bias and be open minded and fair, she said she didn't know if she was capable of that. She said she didn't know if she could truly say she would be prejudiced or not and said, "I really don't feel that I could do it, I mean sit there and judge someone." She was then excused for cause by the trial judge. Juror Thompson stated she had strong reservations about the death penalty but conceded that in some hypothetical circumstances she could request its application. The State's challenge to excuse her accordingly was overruled by the trial court. On further questioning, however, she stated that the death penalty issue would affect her judgment and her ability to fairly judge the guilt or innocence of the defendant. She said "I don't believe I could look clearly at it. It would just bother me so badly to think that I would have to do that to somebody. I don't think, no, probably I couldn't be fair about it." The trial court then granted a motion to excuse Thompson for cause. Thus, both Jurors Steward and Thompson were not excused because they opposed the death penalty but were excused because they indicated they could not fairly judge Appellant's guilt or innocence. As indicated above, they would not be able to weigh the evidence in an impartial manner nor follow the instructions of the trial court in arriving at a verdict. We therefore find that the trial judge did not abuse his discretion by finding it proper to exclude Steward and Thompson for cause since they expressed strong feelings that they could not fairly judge the case on its merits. Juror Seright clearly and irrevocably stated from the outset that he was against the death penalty and could not vote for it under any circumstances. Jurors Seright and Faulkner then are the only ones who were excused because they were opposed to the death penalty and both of them stated unequivocally that they could

not vote for the death penalty under any circumstances. They were properly excused for cause pursuant to the standards set by *Witherspoon, supra.* We find no error on this issue.

## IV

Appellant next claims that the trial court should have granted his motion for additional peremptory challenges because "a higher standard of due process is required in death penalty cases than in other cases because of the severity and finality of the punishment involved." He also claims a higher number of peremptories would have increased his chances for a fair trial. The Legislature has already provided that death penalty cases are entitled to extra peremptory challenges by giving both the defendant and the State twenty peremptory challenges rather than the ten given in other felony cases. Ind.Code § 35-1-30-2 (Burns 1979) [Repealed effective September 1, 1982; replaced by Ind. Code § 35-37-1-3 (Burns 1985)]. Appellant received the twenty peremptory challenges in the instant case and, in addition, asked for and received two additional peremptory challenges by the trial judge. Appellant points out no particular circumstance that prejudiced him from a denial of additional peremptory challenges over the 22 already granted to him. A trial court has broad discretion in controlling *voir dire, Grimes v. State,* (1983) Ind., 450 N.E.2d 512, and we find no showing here that the trial court abused its discretion by the manner in which it controlled *voir dire.* We accordingly find no error.

## V

Appellant attempted to have Coroner Van Kley give his opinion as to the time of death of the victims but the State's objection to the giving of this testimony was sustained. The coroner testified that he was a veterinarian by training and had never studied the fixing of time of death in either humans or lower animals and felt that he was not qualified to determine the time of death in homicides. During cross-examination, Appellant established that the coroner had read a handbook for coroners written by a pathologist which gave the following two methods to determine the time of death: rectal body temperature and potassium level in eyeball fluids. The coroner stated that although he had read about those two techniques, he did not believe in them and therefore did not collect the required data to make the two tests and to form an opinion. He stated that determining the time of death of lower animals was not necessary as a veterinarian so he never learned to do it. Moreover, he never learned to determine the time of death of a human being and so was unable to do it. It appears that Coroner Van Kley had written some personal observations and an opinion while examining the Millers' bodies and Appellant wished to have him testify about that opinion. The trial court found, however, that he was not qualified to give an opinion on time of death and excluded the testimony. We find no error in the trial court's ruling. Not only did Van Kley testify that he was not qualified as an expert to make such a finding but he further testified that he had not made any tests or observations from which he could form such an opinion. Any testimony he might give on this subject therefore would have no probative value and would not aid the trier of fact in its search for truth. *See Grimes, supra.* We find no error.

## VI

Appellant also contends that certain rulings of the trial court concerning the admission of certain testimony and physical evidence were erroneous. We first note the standards applied in the appellate review of admissibility questions. The question of admissibility of any particular evidence is within the discretion of the trial court and the trial court is accorded wide latitude in ruling on the relevancy of evidence. Even if offered evidence or testimony is only marginally relevant, it is within the sound discretion of the trial court to determine its admissibility. *Henderson v. State,* (1983) Ind., 455 N.E.2d 1117; *Mar-*

*chand v. State,* (1982) Ind.App., 435 N.E.2d 284, *reh. denied.* Evidence is relevant when it throws or tends to throw light on the guilt or innocence of an accused even though its tendency to do so is slight. *Grimes, supra.* Admission of physical evidence is governed by the same rules of relevancy and materiality which govern the admission of testimonial evidence. *McCurdy v. State,* (1975) 263 Ind. 66, 324 N.E.2d 489.

 Appellant claims witness Brook's testimony was rambling and lengthy and did not point to the time and place that statements were allegedly made by Appellant. Appellant's only reference to any alleged error is to direct us to pages in the record where it might be found. Appellant further claims five state's exhibits were improperly admitted into evidence. He does not state, however, what these exhibits were, where in the record they might be found, what objections, if any, were made to their admission or why they were inadmissible other than to generally claim that they were not in any way connected with the identity of the person or persons who killed the Millers. Appellant further complains that the trial court refused to admit one of his exhibits, Defendant's Exhibit 23, which was a letter written by witness Brook. In his argument, Appellant does not refer to any place in the record where this letter and its tender may be found. His final contention is that all of the matters specified in paragraphs 11 through 20 of his Motion to Correct Errors were improperly admitted because they were irrelevant and prejudicial. There is no description of this evidence nor any discussion about why they were prejudicial and irrelevant. Moreover, there again is no notation as to where tender, objections or admission can be found in the record. It does appear that the items he speaks of in this objection are the same five State's Exhibits previously mentioned. In his argument appellant describes the contents of specifications 11 through 20 but still does not point out where in the record they may be found or where any objections made to them or any rulings by the trial court re-

garding them may be found. Failure to present a cogent argument for such an issue operates as a waiver of that issue on appeal. Ind.R.App.P. 8.3(A)(7); *Guardiola v. State,* (1978) 268 Ind. 404, 375 N.E.2d 1105. This Court has held: "Errors alleged by defendant but not presented and argued in the argument section of defendant's brief are waived." *Guardiola,* 268 Ind. at 406, 375 N.E.2d at 1107. It is the responsibility of the defendant to support his contentions with appropriate citations to the record as well as to legal authorities. Without such assistance, this Court cannot determine the merits of his claim and will consider it waived. *Grimes, supra.* Appellant has waived this issue.

## VII

 Appellant next contends that the trial court erred by failing to find that the prosecutor made improper remarks during final argument. During his rebuttal final argument, the prosecutor made the following remarks:

"... I don't know what else we could give you now. The whole thrust of the State's case has been to give you everything we could, everything available. We did our best, and we did our best to be fair and impartial and, believe me, I'm one of them. Us versus them that Theresa McVety talked about, but if you think we haven't played this by the book of rules, then I'm sorry that you think that, because I'll tell you what, we've given you everything there is. We've given you a fair view of the entire case. We have been as sincere as possible and at this point in time, if you don't feel like I do, then I have failed, and the police have failed, and I don't want that. I'm convinced—"

Defense counsel immediately objected to the prosecutor stating what he was convinced of and the trial court sustained the objection and admonished the jury to disregard the prosecutor's opinion about being convinced. The prosecutor apologized for his remark. As soon as the jury left the

courtroom, defense moved for a mistrial based upon the prosecutor's misconduct in telling the jury that he's convinced of Appellant's guilt. The State contended the prosecutor had not completed saying whatever he was going to say and asked the trial court to verify this by listening to the record. The trial court thereupon adjourned and listened to the record but when it reconvened the trial, the defense withdrew its motion for mistrial on instructions by Appellant who verbally affirmed this decision to the trial court. Appellant further objects to a portion of the State's argument during the penalty phase where the prosecutor allegedly asked the jury to set an example for the community by sentencing someone to death. In *Burris v. State*, (1984) Ind., 465 N.E.2d 171, *cert. denied* (1985) — U.S. —, 105 S.Ct. 816, 83 L.Ed.2d 809, this Court discussed the issue of prosecutorial misconduct in final argument as follows:

"*Maldonado v. State*, (1976) 265 Ind. 492, 355 N.E.2d 843, is the leading case on prosecutorial misconduct. The following factors are to be considered when reviewing a charge of prosecutorial misconduct:

1. The Court first determines that the prosecutor in fact engaged in misconduct. This determination is made by reference to the case law and the disciplinary rules of the Code of Professional Responsibility as adopted in this State. [Citation omitted].

2. The Court then considers whether the misconduct, under all the circumstances, 'placed [the defendant] in a position of grave peril to which he should not have been subjected.' [Citations omitted]. The 'grave peril' standard does not require the Court to find that the misconduct determined the outcome of the trial. [Citation omitted]. This is the same standard which *White* [*v. State*, (1971) 257 Ind. 64, 272 N.E.2d 312] mandates trial courts to observe in ruling on mistrial motions.

3. Whether the misconduct results in subjecting the defendant to 'grave peril' is determined by the probable persuasive effect of the misconduct on the jury's decision, not by the degree of impropriety of the conduct. [Citation omitted].

4. Even if an isolated instance of misconduct does not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal may still result. [Citations omitted].

*Id.* 265 Ind. at 498–99, 355 N.E.2d at 848. *Maldonado* also held that this Court prefers 'to decide issues on their merits, and not to erect procedural obstacles to their presentation. However, a prompt objection affords the trial court an opportunity to prevent or remedy prejudice to a defendant without the considerable waste of time and resources involved in the reversal of a conviction, and for this reason a contemporaneous objection is required as a condition to appellate review.' *Id.*"

*Burris*, 465 N.E.2d at 186.

The prosecutor's statement implying that the State was sincere, fair and impartial and that he was convinced of something was not sufficient to put Appellant in grave peril to which he otherwise would not have been subjected. The trial judge admonished the jury to disregard the statement and Appellant withdrew his motion for mistrial.

■ The State concedes it would be incorrect for the prosecution to ask the jury to set an example for the community by sentencing someone to death. The State contends, however, that an examination of the language of the prosecutor's closing statement during the sentencing phase of Appellant's trial would show that this was not the intent of the prosecutor's statements. During the penalty phase of the trial, the prosecutor noted an emotional letdown after the difficult work of returning a verdict as to Appellant's guilt. The prosecutor accordingly encouraged the jury to keep up its energy and to stay in there and not quit as he said "... The

law's important to me. The law's important to you. It's important to all of us. And what you've done here and what you're asked to do here is set an example for this community, for the law." The subject of the prosecutor's statements at that time was not to direct them toward a certain judgment but to encourage them to keep working to finish their job. As the State points out, the prosecutor did not encourage them to grant the death penalty but rather encouraged them to keep going until the trial was completely over. At no time in final argument did the prosecuting attorney recommend the death penalty to the jury. The only language in that regard was the prosecutor's statement that he felt the State had proven an aggravating circumstance in the two murders and had discussed the mitigating circumstances urged by Appellant. The prosecutor specifically asked the jury to consider all possible mitigating circumstances using common sense and reason and said that if they did so, no matter what the result was, "that you will know in your heart you did what was right, what was fair, and I'm not going to suggest to you what that is because it's not necessary." The prosecutor did not inject his personal opinion as to why the death penalty was proper or infer that the jury owed it to the community to so find. The trial court did not abuse its discretion in denying Appellant's mistrial motion.

### VIII

Appellant next claims the trial court erred by permitting him to be cross-examined on his prior silence. Appellant raised no objection at trial. After Appellant testified and had given his version of this incident claiming he did not commit the instant crimes, the prosecutor asked him: "[P]rior to the beginning of this trial, did you ever tell the story that you've told today to anyone besides your attorneys?", "Were you ever given any opportunity to tell the story to anyone?" and "Did you give it?" In response to the last question, Appellant answered "No, I exercise my *Miranda* rights." *See generally Miranda v. Arizo-*

*na,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The prosecutor then asked three questions concerning Appellant's understanding of his *Miranda* rights before moving on to another subject. It is the State's contention that no reference was made to Appellant's silence but rather he was cross-examined on the facts he gave during his direct testimony to test their credibility. The prosecuting attorney made reference to Appellant's version of the case during final argument when commenting on the credibility of the State's evidence. The State contends that the prosecutor's statements were for the purpose of showing that Appellant had an opportunity to hear all of the State's evidence and to make an assessment of it before giving his testimony in court while the State gathered its evidence and presented it without knowing what Appellant's version would be until he told it in court. The prosecutor's words were:

"The Defendant denies that he was there. And even though it's not testimony, looking through it in the opening statement, [Defense Counsel] Mr. Scruggs said that he, the Defendant, went there that night to Bobby Nutt's. Now the only person that's important to me is, I was looking, I was listening, waiting to hear so that I would know what the Defendant was going to say. You know, I didn't hear him until he sat up here, and you heard him just like I did. He had everything I had but I could never talk to him. I couldn't use prior inconsistent statements to impeach him because I didn't have any. He never said anything...."

Appellant relies on *Doyle v. Ohio,* (1976) 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, which held that it was improper to use, for impeachment purposes, a defendant's silence at the time of arrest and after receiving *Miranda* warnings. This holding was because the U.S. Court reasoned that there are other possible reasons for silence which are consistent with the existence of an exculpatory explanation and that the giving of a *Miranda* warning

in itself carries an implicit assurance to any person who receives it that silence will carry no penalty. It therefore would be fundamentally unfair to allow the silence to impeach the subsequent explanation at trial. The direction of the questioning here and the comments during final argument, however, were not directed at Appellants' pretrial silence but rather were directed at what he said during his testimony. In *Fletcher v. Weir*, (1982) 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490, the United States Supreme Court declined to extend *Doyle* to prohibit all comment on post-arrest silence and, in reversing the circuit court, held that only the "affirmative assurances embodied in the *Miranda* warnings" render it fundamentally unfair to permit cross-examination on post-arrest silence. Here, when Appellant indicated he made no statement because of his *Miranda* rights and the State determined he understood those rights, they dropped the subject and did not attempt to impeach him or to indicate a presumption of guilt because of his silence. In *United States v. Massey*, (10th Cir.1982) 687 F.2d 1348, the Circuit Court discussed the circumstances where a line of questioning and comment upon a defendant's post arrest silence after *Miranda* warnings may be held harmless error even though it violates the *Doyle* rule. The test of whether a violation of *Doyle* is harmless, as stated in *Massey*, involves the following factors: "1. The use to which the prosecution puts the post-arrest silence. 2. Who elected to pursue the line of questioning. 3. The quantum of other evidence indicative of guilt. 4. The intensity and frequency of the reference. [and] 5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions." *Massey*, 687 F.2d at 1353 (*quoting Williams v. Zahradnick*, (4th Cir.1980) 632 F.2d 353). The intensity here, of course, was very limited as we have indicated and there was no opportunity for the trial judge to rule since no objection was made. It is apparent, taken in context, that the State contrasted its position with Appellant's to bolster the credibility of its own evidence and the State did not infer that Appellant's post-arrest silence directly impeached him to the extent the jury would be justified in finding him guilty because of such silence or because of his failure to come forward. There also was a great deal of other evidence indicative of Appellant's guilt. Brook's testimony has already been recounted. Appellant was known to carry a "super .38" pistol which was one of only three types of gun ever manufactured—one out of production for a number of years—that used the same distinctive type of ammunition. The casings found in the victims' bedroom matched this distinctive type of ammunition and also matched casings found at another location where Appellant had only recently been firing his pistol at a target with other witnesses. Appellant told several people in addition to Brook that he was going to "blow away" the Millers for "dropping a dime" on him and made statements before fleeing Indiana that indicated he committed the crimes. The situation here does not parallel *Doyle* in which there was an attempt to impeach the defendant on his silence and to encourage the jury to find him guilty because of it. We therefore find no error on this issue.

### IX

▮▮▮▮▮ Appellant contends the trial court erred by granting the State a motion *in limine* thereby preventing, for impeachment purposes, the introduction of evidence concerning witness Brook's prior conviction. Appellant does not furnish us in his Brief any information as to where in the record we can find the State's motion *in limine*, arguments concerning it, the trial court's ruling or any evidence as to the nature of Brook's prior offenses. In the summary of his argument, Appellant mentions a prior conviction on a firearms violation—possession of a sawed-off shotgun—and alleges that Brook once shot his wife but he does not allege that any conviction other than the firearms violation ever resulted. Furthermore, we find nowhere in the record any instance where the defense

made an offer to prove Brook's prior convictions. Without making such an offer, nothing regarding a motion *in limine* is preserved for review. The ruling upon the alleged motion *in limine* in Appellant's case therefore is not reviewable on appeal. Moreover, the office of such a motion is not to obtain a final ruling upon the admissibility of evidence. When the trial court grants the plaintiff's motion *in limine* and the defendant fails to make an offer of proof during trial, the defendant has not reserved for appellate review any alleged error pertaining to that evidence. *Smith v. State*, (1981) Ind., 426 N.E.2d 364; *McCraney v. State*, (1981) Ind., 425 N.E.2d 151. No error is presented on this issue.

## X

█ Appellant was extradited from Florida and maintains that under the Agreement on Detainers Act, Ind.Code § 35–33–10–4 (Burns 1985), the failure to bring him to trial within one-hundred-twenty days of his extradition was jurisdictional error. He concedes, however, that he was not convicted or charged with a crime in Florida and therefore was not subject to the provisions of said Act pursuant to *Pallett v. State*, (1978) 269 Ind. 396, 381 N.E.2d 452, *reh. denied*. He makes no argument that he is entitled to relief but claims he included the issue and argument in his Brief only to preserve the issue. He presents no issue for review. Ind.R.App.P. 8.3(A)(7).

## XI

█ Appellant next claims on appeal that the State failed to inform him as to certain items of physical evidence found in the murdered couple's room. Appellant's claim seems to be directed to certain coins found near the victims. The State introduced two dimes which were found near the bodies of the two victims. The only objection made to their admission related to their relevance. The State showed, however, that Appellant frequently made reference to the fact that he would kill or "blow away" anyone who "dropped a dime" on

him, that is, anyone who informed on his drug operation. Appellant argues that there were other coins such as nickels, pennies, and quarters, also found at the crime scene and that the State removed them and withheld their existence from the defense until the time of trial. Appellant cites us to nothing in the record to substantiate this claim and he made no motion to exclude the dimes on this basis nor did he move for a continuance on account of the surprise of learning about other alleged coins. There was some reference during the trial to a quarter found on the bed of the murdered couple and Kenny Miller, the discoverer of the bodies, indicated during cross-examination that in moving his jacket he possibly could have spilled coins out of it. There is no indication that Appellant made any reference at trial to the State withholding any discovery, including any coins. The State further points out that one of the exhibits in this case was a videotape of the murder scene with the bodies in the room undisturbed. All counsel had an opportunity before trial to see that videotape, which shows everything in the room clearly, including the two dimes next to the bodies and the quarter on the bed. Thus, defense counsel were informed as to all items of physical evidence that were in the room and Appellant therefore was not prejudiced by the State if it did, in fact, withhold any physical evidence collected in the murder room. The tape also showed there were no other coins in the room other than the two dimes and the quarter. Notwithstanding the alleged error, the proper remedy for the State's failure to comply with a discovery order is a continuance unless the State's failure to produce is so misleading or demonstrates such bad faith that exclusion of the evidence is the only way to preserve a defendant's right to a fair trial. Failure to do so is a waiver. *Riley v. State*, (1982) Ind., 432 N.E.2d 15, *reh. denied; Miller v. State*, (1980) 273 Ind. 493, 405 N.E.2d 909. Appellant does not show there was any discovery failure by the State during trial nor does he show that he raised any such question before the trial

court. He therefore presents no issue for our review.

### XII

■ Appellant also claims that Indiana's capital punishment scheme is unconstitutional due to the degree of prosecutorial discretion it vests in charging. This Court has considered this particular contention before and rejected it. *Schiro, supra; Williams v. State,* (1982) Ind., 430 N.E.2d 759, *appeal dismissed* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47. The United States Supreme Court likewise has specifically held there is no constitutional provision prohibiting prosecutorial discretion in charging the death penalty. *Jurek v. Texas,* (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Proffitt, supra; Gregg v. Georgia,* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. In *Resnover v. State,* (1984) Ind., 460 N.E.2d 922, *cert. denied,* — U.S. ——, 105 S.Ct. 231, 83 L.Ed.2d 160, this Court rejected this contention while noting that the proponents of this contention overlook the fact that after the prosecutor makes his charge, "a subsequent [judicial] procedure dictated by statute prevents the arbitrary and capricious infliction of a death penalty." *Resnover,* 460 N.E.2d at 929. This Court also has held: "[A]ny discretionary power that is vested in the prosecuting attorneys under the death penalty statute is exercised under the control of the courts of this state." *Williams,* 430 N.E.2d at 766.

### XIII

■ Appellant further contends that Ind.Code § 35–50–2–9 (Burns 1985) is unconstitutional since it permits the trial court to make a judgment of death despite a jury recommendation to the contrary. We already have decided this issue adversely to Appellant's position in *Schiro, supra.* The United States Supreme Court also has decided the issue adversely to Appellant's position in *Spaziano v. Florida,* (1984) — U.S. ——, 104 S.Ct. 3154, 82 L.Ed.2d 340. Furthermore, the jury in the instant cause did recommend the death penalty and the trial judge followed the jury's decision by imposing the death penalty. There is no error on this issue.

### XIV

■ Appellant further attacks the constitutionality of our death penalty scheme, claiming it does not afford adequate appellate review. This Court has stated: "We have consistently held that because of procedure mandated by statute, codified by rules, and controlled by cited precedent, 'this Court can then meaningfully and systematically review each case in which capital punishment has been chosen, in light of other death penalty cases.'" *Burris,* 465 N.E.2d at 191 (quoting *Judy, supra.*); *Smith v. State,* (1984) Ind., 465 N.E.2d 1105, *reh. denied.* Our review standards meet those mandated by the United States Supreme Court in *Proffitt, supra,* and *Gregg, supra.*

### XV

■ Appellant contends that Indiana's death penalty scheme is unconstitutional in that it permits the State to commence a capital prosecution by information rather than by indictment. He concedes that since *Hurtado v. California,* (1884) 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232, it has been settled law that the Federal constitutional provision requiring grand juries is not applicable to the states and that the states may initiate criminal prosecutions by information. We note that Ind.Code § 35–34–1–1(a) (Burns 1985) provides: "Any crime may be charged by indictment or information." Accordingly, there is no merit to Appellant's contentions on this issue.

### XVI

■ Appellant claims the trial court committed reversible error by refusing Appellant's request for a second *voir dire* of the jury after the verdicts and before sentencing. Appellant claims this second *voir dire* was required to ensure that the death sentence was not arbitrarily or capriciously applied since there was great probability

that the jury already had determined to recommend the death penalty without considering the evidence of mitigating circumstances. The United States Supreme Court has affirmed convictions pursuant to death penalty statutes that make no provision for changing any jury personnel from the guilt phase to the sentencing phase. *Gregg, supra; Jurek, supra; Proffitt, supra.* In *Gregg,* the U.S. Court approved the Georgia capital sentencing statute which, *inter alia,* provided a separate sentencing hearing before the same jury in which evidence considered during the guilt phase could be considered during the sentencing phase. Under Georgia's statute this evidence is introduced automatically without need for formal resubmission of the evidence. *Gregg,* 428 U.S. at 164, 96 S.Ct. at 2921, 49 L.Ed.2d at 869. In approving the Georgia scheme, the Supreme Court held that it was desirable for the jury to have as much information before it as possible when it makes the sentencing decision. The Georgia scheme is, of course, similar to Indiana's statutory scheme in this regard. In *Smith, supra,* this Court concluded that capital punishment determinations should be based on an individualized determination of the nature of the crime and the nature of the offender. Such an individualized determination therefore would "permit, if not compel, the sentencing authority to have before it all the facts adduced at the trial of guilt." *Smith,* 465 N.E.2d at 1114. We further held: "[A] jury which convicted a defendant of a capital crime is capable, without prejudice, to determine aggravating and mitigating circumstances so long as this does not require what amounts to another trial on different facts. There is no error in submitting the question of sentencing recommendations to the same jury that heard the guilt phase of the trial." *Smith,* 465 N.E.2d at 1114. The jury that determines the sentence recommendation would have to be made aware of all the evidence from the guilt phase anyway, including that evidence which Appellant now claims would be persuasive of the death penalty. After all, the result would be the same whether the jury is automatically the

same as at the guilt phase or is a new one for sentencing only. No error is presented on this issue.

### XVII

▮▮▮▮ Appellant next claims the trial court erred by modifying its tendered instruction 30. This instruction was a statement of the reasonable doubt standard for finding an aggravating circumstance and followed Ind. Code § 35–50–2–9 except that it added that the jury must be convinced of the existence of the aggravating circumstance "to a moral certainty" and beyond a reasonable doubt. "To a moral certainty" was language added by Appellant that was not required by the above statute. The trial court struck this provision. It is generally proper to give instructions in the exact language of the statute when the statutory language is not unconstitutionally vague or misleading. *Musick v. State,* (1972) 258 Ind. 295, 280 N.E.2d 602, *reh. denied; Joy v. State,* (1984) Ind.App., 460 N.E.2d 551. Furthermore, a particular instruction will not warrant reversal unless the created error is of such a nature that the whole charge of which it forms a part misleads the jury as to the law of the case. *Daniels v. State,* (1980) 274 Ind. 29, 408 N.E.2d 1244. The statute, Ind.Code § 35–50–2–9, does not require the jury to find an aggravating circumstance beyond a reasonable doubt *and* "to a moral certainty." The trial court therefore correctly instructed the jury. It is not error to deny an instruction if it is not a correct statement of the law or if another instruction covers the subject matter of the tendered instruction. The trial court did not err in the giving of this instruction in its modified form.

▮▮▮▮ Appellant further claims that the trial court erred by refusing to give his tendered instructions 3, 4, 7, 8, 18, 19, and 23. The only explanation Appellant gives for these instructions is that No. 3 contained the essence of his alibi defense. Unfortunately, Appellant does not set out the instructions in the argument section of his brief nor does he furnish us with the verba-

tim objections, if any, made thereto pursuant to our Ind.R.App.P. 8.3(A)(7). Instead, the instructions were placed in an appendix to Appellant's Brief. The only argument Appellant makes on these instructions is to generally state that they were relevant to the issues and that they correctly stated the law as to those issues and therefore were proper instructions. Appellant makes no contention that the charge to the jury as actually given was in any way incomplete or misleading. The test of whether a tendered instruction is proper is whether there is evidence to support the giving of the instruction, whether the substance of the tendered instruction is covered by other instructions and whether the instruction properly states the law. *Richey v. State,* (1981) Ind., 426 N.E.2d 389. Moreover, jury instructions lie largely within the trial court's discretion. *Coonan v. State,* (1978) 269 Ind. 578, 382 N.E.2d 157, *cert. denied,* (1979) 440 U.S. 984, 99 S.Ct. 1798, 60 L.Ed.2d 246. Instructions also must be construed as a whole and if, when so construed, they state the law fully and correctly they are correct. *Richey, supra.* Appellant makes no claim that his tendered instructions were justified by the evidence or that their substance was not covered by the actually given instructions. Furthermore, Appellant's failure to present a cogent argument operates as a waiver of this issue on appeal. Ind.R.App.P. 8.3(A)(7); *Guardiola, supra.* In addition to this waiver, Appellant has waived this issue by failing to properly present the instructions in his argument pursuant to Ind.R.App.P. 8.3(A)(7) and, further, he failed to sign each tendered special instruction pursuant to *Askew v. State,* (1982) Ind., 439 N.E.2d 1350 [relying upon Ind.Code § 35–1–35–1 (Burns 1979) (repealed effective September 1, 1982) (replaced by Ind.Code § 35–37–2–2(6) (Burns 1985). Appellant accordingly has waived this issue and presents nothing for us to review on appeal.

## XVIII

 Finally, Appellant claims he was victimized by the ineffective assistance of his trial counsel and he sets out several specific instances to illustrate his trial counsel's alleged ineffectiveness. The guidelines for determining competency of counsel require deciding (1) whether counsel's performance was so deficient that he or she was not functioning as counsel as guaranteed by the Constitution, and, if so, (2) whether this failure to function as counsel was prejudicial, that is, counsel's errors were so serious as to deprive the defendant of a fair trial. A fair trial will be deemed to have been denied when the conviction or sentence resulted from a breakdown in the adversarial process that rendered the result unreliable. *Strickland v. Washington,* (1984) 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Elliott v. State,* (1984) Ind., 465 N.E.2d 707. The defendant accordingly must affirmatively prove prejudice by showing that the unreasonable error of his counsel actually had an adverse effect on the trial. To combat the temptation to apply hindsight, the reviewing court must require the defendant to overcome a presumption that the challenged conduct or action might be construed as sound trial strategy. It is the State's contention that the record in Appellant's case demonstrates that his trial counsel presented a vigorous defense. He engaged in full discovery and Appellant makes no allegation that his counsel failed to investigate or procure all witnesses possible on his side. Counsel appears to have been fully informed of the · evidence in Appellant's case and anticipated all of the State's evidence. He thoroughly and properly cross-examined all witnesses. The State points out that in regard to the State's chief witness, Brook, Appellants effectively attacked Brook's credibility by attempting to characterize him as one who was "spaced out" from the use of drugs to the extent that his testimony was unreliable. Counsel also very effectively used the time frames of all the witnesses to attack the State's position that Appellant had committed these crimes between 10:30 p.m. and 1:00 a.m. The areas of incompetence alleged by Appellant in his brief pertain to certain points of trial strategy that Appellant asks us to review in hindsight.

■ Appellant first specifically claims his counsel improperly permitted this case to progress with his drug-related background coming into issue. In the first instance, counsel made the decision to openly admit Appellant's participation in dealing in marijuana, apparently feeling it would be a better choice of strategies to allow such evidence in without appearing to hide anything and then perhaps attempting to portray dealing in marijuana as no more serious than dealing in alcohol or some other intoxicant. Appellant's admission of this activity also might give credibility to his defense of the murders here. Furthermore, it appears that it would have been impossible for Appellant's counsel to keep the drug involvement out of this cause as this involvement was part and parcel of the murders themselves. Much evidence tended to show that Miller in fact worked for Appellant in his drug business and that Appellant's motive for killing the Millers involved developments in the business. It is clear that the marijuana dealing which runs through this case was entirely relevant to the murders and there is little likelihood that the defense could have prevailed on any objections or motions tending to prevent its admission.

■ Appellant further alleges ineffective representation by his counsel failing to object to the admission of Bobby Nutt's .38 revolver and to the State's use of Appellant's silence. We already have pointed out that the State's mention of Appellant's pretrial silence was intended to contrast the degree of trustworthiness of the State's evidence versus that of Appellant's trial testimony. The failure of Appellant's counsel to object to the admission of Nutt's pistol is insignificant since any objection probably would have been fruitless. There was, after all, direct evidence that Appellant shot his "super .38" automatic pistol at the target shooting site where casings were found that matched those found at the murder scene. It was relevant to show that Nutt's revolver was not the one that fired shells in either place. Thus, it would have been fruitless to object to this evidence and counsel made a decision based on this view.

■ Appellant also attacks his trial counsel's decision to move to have his case sent back to Howard County after he already had obtained an automatic change of venue to Wabash County. Appellant personally joined in this motion, however, and assured the trial court that he was agreeable to this tactic. Counsel's reasons for this decision could well have been that he wanted the jury to be transported to the scene of the murders, a matter which would have been more practical in the same county. Counsel apparently wanted the jury to view the murder scene to conclude that it would have been impossible for an automobile to go unnoticed past the landlady's house to the Miller's trailer so late at night when the landlady, by her testimony, was still awake. This would be one basis for having the cause returned to the county of venue of the crime. Counsel may also have wanted to be in a larger and more industrialized county rather than in a small rural county in view of Appellant's tactic to characterize dealing in marijuana as a rather benign sort of drug trafficking. As the State points out, this was a tactical decision which could not be said to constitute deficient performance and certainly was not sufficiently prejudicial to Appellant to find reversible error.

■ Appellant further claims his trial counsel showed incompetence by allowing the excuse of jurors who had not been properly "death qualified." The record, however, does not show that counsel allowed any such thing. The defense objected to the excuse of all of the jurors on these grounds. His objections were successful in two out of three instances when jurors were so excused and only one of them actually was excused on those grounds. The other two were later excused on other grounds. The record shows that counsel very vigorously and effectively opposed the State's tactic in qualifying the jury and well represented Appellant in this regard.

Appellant claims his counsel allowed impeachment evidence to be used as substantive evidence during argument. In particular, he refers to the pretrial statement given to police by witness Susan Isaacs wherein she repeated an alleged statement by Appellant threatening to get the Millers for snitching on him. She did not acknowledge in her testimony having made such a statement and the State impeached her on it. Defense did not object to the State referring to this impeachment in final argument or seek an instruction limiting the use to which the jury could put it. The record shows, however, that there was a significant amount of direct substantive testimony showing that Appellant made such statements about the "snitch" to a number of witnesses so any effect the jury might have given to Isaac's statement in this instance would be nothing more than cumulative. Brook and many of the other witnesses testified that Appellant was aware someone had informed on him which caused his agent, Nutt, to be arrested and a large amount of his drugs lost. Appellant had made many statements of finding the person who did it and "blowing him away." He even made several statements that he was convinced that Miller was the one who did it and obtained the "super .38" pistol for the purpose of killing Miller. This one instance where the defense might have pointed out to the jury that the statement of Isaacs was impeaching rather than substantive would have been objection in form only with no substantial benefit to Appellant other than to draw further attention to the subject.

Appellant also assigns misperformance to his attorney for withdrawing the mistrial motion after the jury was admonished and the State apologized when the prosecutor began a sentence with the statement that he was convinced of something. We already have considered this issue and found that there was no prejudice done in view of the fact that the prosecutor never finished his statement and the trial court admonished the jury. There certainly were no grounds for a mistrial at this point as the prosecutor had not said anything preju-

dicial and defense counsel was successful in cutting off any potential improper language by the prosecutor. Counsel's alertness here prevented any prejudice to Appellant and certainly gives no grounds for finding incompetence to Appellant's prejudice.

Finally, Appellant claims that his trial co-counsel Scruggs had a conflict of interest due to the fact that he previously had represented witness Bobby Nutt. The defendant who raises an objection on this ground must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. The mere possibility of conflict is insufficient to impugn a criminal conviction and until a defendant shows that his counsel actively represented a conflicting interest, he has not established the constitutional predicate for his claim of ineffective assistance. *Cuyler v. Sullivan*, (1980) 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333; *Richardson v. State*, (1982) Ind., 439 N.E.2d 610, *reh. denied.* Apparently counsel Scruggs did at one time represent Nutt but obtained no confidential information at all from him. Counsel Scruggs submitted this question to the Chairman of the Legal Ethics Committee of the Indiana State Bar Association and said Chairman concluded from the facts that no conflict of interest existed because of the lack of any confidential information. Scruggs followed the advice of the chairman, however, and immediately withdrew as counsel for Nutt in order to avoid any appearance of impropriety. The record reveals that the defense put in a request to have Scruggs retained as co-counsel at county expense and that Appellant personally reviewed Scruggs' correspondence with the ethics chairman concerning this representation and therefore was totally aware of the facts. Appellant in fact assured the trial court that he was informed, had read the letters and wished to waive any conflict issue arising from this circumstance. Appellant now shows no facts that would indicate his waiver was done without his being fully informed nor does he show any fact regarding Scruggs and Nutt's at-

torney-client relationship that he alleges was unknown to him at the time of his waiver which prejudiced his trial. He alleges nothing that Scruggs did or failed to do. as a result of any alleged conflict. There is, therefore, no showing here that Appellant has any grounds to claim prejudicial conflict of interest on the part of Attorney Scruggs.

Appellant has failed to overcome the presumption that his attorney acted competently and effectively. Specifically, he has not shown that his counsel's performance was so deficient that counsel was not functioning as counsel as guaranteed by the Constitution nor that any failure to function as counsel was prejudicial to the extent that it deprived Appellant of a fair trial. We accordingly find no error on this issue.

■ Having disposed of all of the issues raised by Appellant we now review the propriety of the death penalty in Appellant's case pursuant to our responsibility to do so. An examination of the record of this cause clearly supports the conclusion of the trial court that the imposition of the death penalty was appropriate considering the nature of the offense and the character of the defendant. The trial judge made very detailed findings and demonstrated his reasons for coming to the judgment he did. Appellant was upset when he concluded that Miller had informed on him causing him to lose a great deal of his drug supplies and placing him in jeopardy because he was not able to pay the considerable debts he owed to his Florida suppliers. Appellant openly expressed an intent to "blow [Miller] away" and obtained the weapon to do so. The facts amply demonstrated beyond a reasonable doubt that Appellant killed both the Millers in their bedroom with that weapon. The trial court found that the Millers were murdered in execution style since each was shot while standing and then again while lying on the floor of their bedroom; whether either was conscious or unconscious, we shall never know. They were shot several times and the angle of trajectory indicates the person who did the shooting was standing directly above each victim. This is not a case of a shooting involving a burglar who was surprised while burglarizing a home. The facts established that Appellant entered the house trailer in the manner of a classical burglary but with a state of mind bent upon liquidating the occupants. The trial court then found that the State had proved beyond a reasonable doubt the aggravating circumstances and carefully reviewed all potential mitigating circumstances finding that the mitigating circumstances did not in any way affect the conclusions mandated by the aggravating circumstances. The trial court found the jury recommendation to be proper and lawful and accepted that recommendation and imposed the death penalty. The trial court fully complied with the proper procedures mandated in the statute and case law on this subject and we find that the imposition of death recommended by the jury and imposed by the trial court was not arbitrarily or capriciously arrived at and is reasonable and appropriate considering the nature of this offense and the character of this offender.

We affirm the trial court in its judgment including its imposition of the death penalty. This cause is remanded to the trial court for the sole purpose of setting a date for the death sentence to be carried out.

GIVAN, C.J., and DeBRULER and PRENTICE, JJ., concur.

HUNTER, J., not participating.