## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 10 2019, 9:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott H. Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General

Angela Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jan Dollahan, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 10, 2019 <br><br> Court of Appeals Case No. 18A-CR-2396 <br><br> Appeal from the Starke Circuit Court <br><br> The Honorable Kim Hall, Judge <br><br> Trial Court Cause No. 75C01-1606-F6-105 |

**Tavitas, Judge.**

## Case Summary

Jan Dollahan, Jr. appeals his convictions for criminal recklessness, a Level 6 felony, and invasion of privacy, a Class A misdemeanor. We affirm.

## Issues

Dollahan raises three issues, which we restate as follows:

> I. Whether the evidence is sufficient to convict Dollahan of criminal recklessness with a deadly weapon, a Level 6 felony, and invasion of privacy, a Class A misdemeanor.

> II. Whether the deputy prosecutor's comments in closing arguments constituted fundamental error.

## Facts

Dollahan and Robert Cunningham ("Robert") are neighbors in Starke County. Robert lives with his brother, two children, and wife, Amanda Cunningham ("Amanda"). Dollahan's and the Cunninghams' homes are part of a residential neighborhood. Robert "get[s] along great" with all his neighbors except Dollahan. Tr. Vol. II p. 38.

For approximately three years, Dollahan's and Robert's relationship has been strained, and in September 2015, Robert obtained an order of protection against Dollahan and his family. Robert also testified that Dollahan obtained a reciprocal order of protection, prohibiting the Cunninghams from contacting Dollahan and his family after Dollahan "challenged" Robert's order of

protection.[1] *Id.* at 59. Robert installed security cameras on his property around July 2015.

[5] On May 30, 2016, at approximately 8:15 p.m., the Cunninghams' windows were cracked open and, from inside, Robert could hear Dollahan yelling outside. Footage from the Cunninghams' security camera demonstrates that Dollahan was yelling. State's Ex. 2. Shortly thereafter, at approximately 8:30 p.m., Robert was getting in his car to leave for work when he heard "loud booms" in "succession" coming from the direction of Dollahan's home. Tr. Vol. II p. 44. Robert stopped the vehicle to determine the source of the sound and ultimately believed someone set off fireworks.

[6] Later that evening, Amanda was at home and she heard loud noises outside and called the police. Officer Kenneth Tomasko with the Starke County Sheriff's Office arrived at the Cunninghams' home in response to Amanda's call. Officer Tomasko requested a copy of the Cunninghams' security camera footage. Amanda told Officer Tomasko that Robert would be able to provide a copy of the footage the following day.

[7] At around 1:00 a.m., while Robert was on his break at work, he used the internet to review security camera footage from his home. In reviewing the footage, Robert was able to determine that, on two occasions that night, Dollahan shot at the Cunninghams' security camera—once with a pistol and

---

[1] The order of protection was in place due to "numerous harassment calls." Tr. Vol. II p. 85.

once with a .22 rifle. Robert testified that his children play outside but when the shots were fired, the children were inside the home.

[8] When Robert returned home, he inspected the security cameras to determine if Dollahan's shots resulted in any damage. Robert discovered bullet holes in a three-foot tall tree stump in his yard where one of the security cameras was mounted. The tree stump is approximately 100 feet from the Cunninghams' house. Robert did not recover any bullets at the site. Robert provided Officer Tomasko with a copy of the security camera footage.

[9] As a result, Dollahan was charged with Count I, criminal recklessness with a deadly weapon, a Level 6 felony, and Count II, invasion of privacy, a Class A misdemeanor. Dollahan's jury trial began on April 18, 2018. Witnesses testified to the foregoing facts. During closing arguments, the State argued:

> You'll be given jury instructions. And, towards the end of the packet you'll be given, it says under the Constitution of Indiana, the jury is given the right to decide both the law and the facts. In fulfilling this duty, it goes on, you are to apply the law as you actually find it. You are not to disregard it for any reason. So, you'll have it here, and the State isn't trying to argue that you should disregard it.
>
> The jury has the right to decide both the law and the facts. Keep that in mind when you're deliberating. Whether Mr. Dollahan's actions created a substantial risk of bodily injury.
>
> The State would ask you to put yourself in the Cunningham's position. In their home, with the kids, young children, both still awake, they have an autistic son, when this happens. They

weren't hurt; no one was killed here and no one was hurt. And the State's not arguing he was intending to do that – he was intending to hurt anybody. But how would you feel if this was going on in your back yard?

You are all here in this courtroom right now, because you are residents of Starke County. This is your home, too. Is this something that you think should be legal? Is it something that should be permissible? That should be allowed? And do you want your neighbors shooting across your property without you knowing it? Without you being aware; didn't get permission. Is this something you want to see happening in Starke County? If the answer to that question is no, then why? Why don't you? Is it because someone could get hurt? Is it because there's – by doing that you're creating a substantial risk of bodily injury, is that why? Do you want people shooting across your back yard? You have the right to decide both the law and the facts.

*Id.* at 98-99. Dollahan did not object to the State's argument. The jury found Dollahan guilty of both counts.

[10] At sentencing on May 30, 2018, the trial court raised, sua sponte, the issue of the statements made by the State during closing argument. The trial court stated:

However, the Defendant – the Defense lawyers have an obligation to represent their client zealously. And, when I listened to the closing arguments, I was struck by statements made as being certainly worthy of an objection. Likely, worthy of a sustained objection, and perhaps an admonishment, as well as instructing the jurors how to take it.

* * * * *

> One, two statements that I'm not finding are reversible error, I'm finding they need to be looked into. The first one has to do with the Prosecutor suggesting to the jury that they are free to decide the law. And the second is, the Prosecutor suggesting to the jury, that they should put themselves in the victim's position.

*Id.* at 142-43. Accordingly, the trial court determined that it needed some additional time to determine if the statements constituted fundamental error, which would have precluded the trial court from accepting the verdict of the jury.

[11] After the first part of the sentencing hearing, the State filed a brief and Dollahan filed a brief in support of a finding of prosecutorial misconduct as fundamental error. On September 13, 2018, the trial court continued the sentencing hearing[2] and rendered its decision with regard to the comments made by the State in closing argument. The trial court concluded:

> And so, you have to consider all the other evidence in the trial. Like how important were those statements do I think? And the juror's decision of coming back with guilty verdicts? How important do I think that was? Do I think that put the Defendant at grave peril that his lawyers never raised an objection? And the jurors listened to that? And I've concluded that the answer is no. That it doesn't rise to fundamental error, and so, I would call it error; not fundamental error. Because that's a very high

---

[2] The trial court also held a portion of the sentencing hearing on July 13, 2018; however, during that hearing, Dollahan changed counsel, and the trial court continued the sentencing hearing once more.

standard. And anyway, that's what my conclusion is after looking at the law.

The Court now accepts the jury's verdict of guilty to Count I, criminal recklessness, a level 6 felony, and Count II – . . .

*Id.* at 167. Dollahan now appeals.

# Analysis

## I. *Sufficiency of the Evidence*

Dollahan challenges the sufficiency of the evidence of both convictions. When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985), *cert. denied*), *cert. denied.* Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*.* "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). Further, "[w]e will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

### A. Criminal Recklessness

Dollahan argues that the evidence is insufficient to convict him of criminal recklessness because "[t]here is no evidence establishing that anyone was actually present that either Dollahan knew was there, or that was actually put at risk as a result of the discharging of the gun," and, accordingly, there was no "substance to the risk." Appellant's Br. p. 11 (internal quotations omitted). Dollahan does not challenge the sufficiency of any other element of his criminal recklessness conviction.

A person commits criminal recklessness, a Level 6 felony, when a person, while armed with a deadly weapon, "recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person. . . ." Ind. Code § 35-42-2-2. In support of his argument, Dollahan cites *Elliott v. State,* 560 N.E.2d 1266 (Ind. Ct. App. 1990). In *Elliott,* after lunch on a warm, sunny day, a group of Elliott's employees were relaxing outside of Elliott's used car lot, Elliott walked outside and shouted something "to the effect of 'Yahoo, let's party,' walked to the edge of the lot, and fired five pistol shots into the air." *Elliott,* 560 N.E.2d at 1266. The lot where Elliott fired the shots was "on the outskirts of Greenfield, Indiana, and when he fired his pistol, he aimed it upwards at approximately a 10 degree angle towards adjacent uninhabited fields and woodlands." *Id.* at 1266-67. Elliott's employees were not in the line of fire, and there was no evidence presented that anyone was in the woods nearby, although hunters were known to occupy the woods. *See id.*

[15]     A panel of this court concluded that there was no substantial risk of bodily injury present because:

> Elliott's employees were behind him, and the fields in front of him were empty. The State concedes Elliott's shots probably landed in the empty fields or woodlands, but nonetheless argues a hunter could have been in the woodlands, out of Elliott's sight. The State is correct, but its argument is mere conjecture, for which there was no evidence at trial. Since the evidence failed to show any person put in harm's way by Elliott's conduct, there was no substance to the risk created by the firing of the pistol; the risk had no actual existence. Instead, the presence of Elliott's employees behind him and the possibility of a concealed hunter in the woodlands presented only a remote risk of bodily injury.

*Id.* at 1267.

[16]     Here, Dollahan's case is distinguishable. The Cunningham family was not outside; however, the windows to their home were open. Moreover, Dollahan shot at the security cameras surrounding the Cunninghams' home and not in the sky above a rural area as was the case in *Elliott*. The security camera on the tree stump, where Robert found bullet holes, was located only 100 feet away from the Cunninghams' home. Here, the risk was not mere conjecture or even a remote risk of bodily injury. Dollahan's act of pointing a gun and shooting in the direction of Robert's home presented the real risk that someone could suffer bodily injury. Accordingly, the evidence was sufficient to demonstrate a substantial risk of bodily harm.

### B. Invasion of Privacy

[17] Dollahan also argues the evidence was insufficient to sustain his invasion of privacy conviction because there was no proof that Dollahan had actual knowledge of the order of protection or its contents; therefore, Dollahan could not have knowingly violated the order of protection. Dollahan does not challenge any other element of his invasion of privacy conviction.

[18] Pursuant to Indiana Code Section 35-46-1-15.1(a)(2), "[a] person who knowingly or intentionally violates: . . . an ex parte protective order issued under IC 34-26-5 . . . commits invasion of privacy, a Class A misdemeanor." In *Tharp v. State,* 942 N.E.2d 814, 818 (Ind. 2011), our Supreme Court concluded that the evidence was insufficient to find the defendant had knowledge of the order of protection because, while the defendant received an oral notice, the oral notice contained "mixed messages" about whether the order of protection was still valid. In reaching its decision, our Supreme Court asked whether there was "substantial evidence of probative value from which a finder of fact could find beyond a reasonable doubt that [the defendant] knowingly violated a protective order?" *Tharp,* 942 N.E.2d at 818.

[19] The State presented evidence that demonstrated Dollahan's knowledge of the order of protection. Robert testified that Dollahan challenged Robert's initial order of protection and that Robert was also prohibited from contacting Dollahan and his family. Specifically, Robert's testimony on direct examination included the following inquiry by the deputy prosecutor:

Q. When the Court entered that protective order [that Cunningham sought against Dollahan], was there also a reciprocal protective order on behalf of the Dollahans?

A. Yes.

Q. And, what was your understanding of that protective order – that's laid out in the order?

A. My understanding was that it's a mutual protective order so that we couldn't harass each other.

Q. And, were you not supposed to have any contact, direct or indirect?

A. Yes.

Tr. Vol. II pp. 39-40. On cross examination, Cunningham elaborated that the reciprocal protective orders "came from one time. [Dollahan] challenged my restraining order that I had asked for; during the challenge, where he was granted a blank one against me." *Id.* at 59.

[20] Dollahan argues this is insufficient because the order of protection admitted at trial only shows the order of protection that Robert obtained against Dollahan and does not demonstrate that there was a reciprocal order of protection. This argument is a request for us to reweigh the evidence, which we cannot do. *See Gibson,* 51 N.E.3d at 210. It was within the province of the jury to determine the credibility and weight to be given to Robert's statements that Dollahan obtained a reciprocal order of protection, and therefore, had knowledge of the

order of protection and its contents. Robert's testimony of the reciprocal order of protection was sufficient to demonstrate that Dollahan had actual knowledge of the order.

## II. Prosecutorial Misconduct

[21] Finally, Dollahan argues the deputy prosecutor committed misconduct by "urging the jury to convict Dollahan on something other than the evidence admitted during the trial, as well as inflaming their passions" in closing arguments. Appellant's Br. p. 15. At the trial, however, Dollahan did not object to the deputy prosecutor's statements, and Dollahan argues that we must evaluate whether the alleged misconduct constituted fundamental error.

[22] When reviewing a claim of prosecutorial misconduct, we must determine whether the prosecutor: (1) engaged in misconduct that, (2) under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been otherwise subjected. *Ryan v. State,* 9 N.E.3d 663, 667 (Ind. 2014); *see also Nichols v. State,* 974 N.E.2d 531, 535 (Ind. Ct. App. 2012). "'Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct.'" *Nichols,* 974 N.E.2d at 535 (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). We measure the weight of the peril by the probable persuasive effect of the misconduct on the jury rather than the degree of impropriety of the conduct. *Id.*

To establish fundamental error based on prosecutorial misconduct, the defendant must also show that the misconduct: (1) rendered a fair trial impossible or (2) constituted a clearly blatant violation of basic and elementary principles of due process, which resulted in an undeniable and substantial potential for harm. *Id.* Harm is established not by a conviction, but rather upon whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of the truth. *Id.* Misconduct or errors implicating constitutional issues do not necessarily establish that fundamental error has occurred. *Id.*

In his brief, Dollahan points to the following comments as misconduct:

> The jury has the right to decide both the law and the facts. Keep that in mind when you're deliberating. Whether Mr. Dollahan's actions created a substantial risk of bodily injury.

> The State would ask you to put yourself in the Cunningham's position. In their home, with the kids, young children, both still awake, they have an autistic son, when this happens. They weren't hurt; no one was killed here and no one was hurt. And the State's not arguing he was intending to do that – he was intending to hurt anybody. But how would you feel if this was going on in your back yard?

> You are all here in this courtroom right now, because you are residents of Starke County. This is your home, too. Is this something that you think should be legal? Is it something that should be permissible? That should be allowed? And do you want your neighbors shooting across your property without you knowing it? Without you being aware; didn't get permission. Is this something you want to see happening in Starke County? If

the answer to that question is no, then why? Why don't you? Is it because someone could get hurt? Is it because there's – by doing that you're creating a substantial risk of bodily injury, is that why? Do you want people shooting across your back yard? You have the right to decide both the law and the facts.

Tr. Vol. II pp. 98-99.

[25] In *Ryan v. State,* 9 N.E.3d 663, 671-72 (Ind. 2014), our Supreme Court addressed the question that Appellant raises here, namely, whether a prosecutor's arguments invited the jury to convict the defendant for a reason other than the defendant's own guilt. In *Ryan,* the prosecutor argued:

> You wonder at night what you can say to a jury to get them to get the bigger picture here. And no case is easy for your [sic] guys, I get that. No one want[s] to judge someone else or somebody else's actions. But we keep hearing about this happening, whether it's a teacher, or a coach, or a pastor, or whoever. And we all want to be really angry and post online and have strong opinions about it. And we never think that we'll be the ones that are here that get to stop it. And you actually do get to stop it. And as much as I know you probably did not want to be here on Monday morning, I would submit to you that you are in an incredible position to stop it and send the message that we're not going to allow people to do this.

*Id.* at 671. Our Supreme Court concluded:

> Although a prosecutor may remark on the public demand for a conviction, we have repeatedly emphasized that "[i]t is misconduct for a prosecutor to request the jury to convict a defendant for any reason other than his guilt." *Cooper* [*v. State*], 854 N.E.2d [831,] 837 (Ind. 2006) (quoting *Coleman v. State,* 750

N.E.2d 370, 375 (Ind. 2001)); *Maldonado* [*v. State,* 355 N.E.2d 843, 849 (Ind. 1976)]. In *Smith* [*v. State,* 283 N.E.2d 365, 369 (Ind. 1972)]*,* the prosecutor stated in his closing argument that: "You as jurors at this stage of this proceeding have it within your power to set the moral standards for this community." [*Id.* at 369]. After giving two reasons to convict that particular defendant, the prosecutor added, "And I say probably now, more than ever more, you are going to have to come to the spot where it's your turn to stand up and be counted." *Id.* We observed that these comments were not improper. *Id.* In the present case, however, the prosecutor alluded to the "bigger picture," to "hearing about this happening" without a chance "to stop it," and to other perpetrators such as "a teacher, or a coach, or a pastor;" and then implored the jury to "send the message that we're not going to allow people to do this." This clearly invited the jury to convict this defendant for reasons other than his own guilt, therefore constituting improper conduct.

*Id.* at 671-72. Still, our Supreme Court did not reach the question of whether this statement "subjected the defendant to grave peril"—the second prong of the prosecutorial misconduct question—because the Supreme Court ultimately concluded that any error did not rise to the level of fundamental error, which was the standard that governed in *Ryan*. *Id.* at 672.

[26] On the other hand, in *Jerden v. State,* 37 N.E.3d 494, 499 (Ind. Ct. App. 2015), a panel of this Court addressed the prosecutor's closing argument that provided:

\* \* \* \* \*

Our roads are nor [sic] playgrounds. Our roads are not places for young men who think that they can drive faster and better than other people. Our roads are used by families going to church on

Sunday mornings. They are used by people going to and from work.

* * * * *

So, on April 13th of this year these two (2) men went racing through our community. To them it was just a thirty (30) mile stretch of road. To us, though, it's the safety of our neighbors. The defendants put us in danger by the way they were driving that day.

* * * * *

Ladies and Gentlemen, these two (2) men thought that they could race on our tr [sic] . . . on our road. They thought that they could use their well[-]honed driving skills, but in fact what they did is they put us in danger, and that's what danger . . . reckless driving is.

*Id.* Jerden argued that the prosecutor's statements were improper because there was no evidence of the facts the prosecutor referenced, including: (1) the prosecutor's characterization of the road as "just a thirty mile stretch of road"; (2) the prosecutor's implication that Jerden's crime involved actions near a church; and (3) the prosecutor's characterization of the time of day because "the fact that it was a Sunday morning was not relevant to whether he was driving recklessly." *Id.* at 499. Even though a panel of this Court ultimately concluded that it would not need to address whether the prosecutor's comments constituted misconduct because any misconduct did not rise to the level of fundamental error, this Court cited *Booher v. State,* 773 N.E.2d 814, 819 (Ind.

2002), to support the proposition that "prosecutors are free to make arguments from which a jury can draw reasonable inferences from the evidence." *Id.* Using these examples, we turn to the statements before us.

[27] We characterize the deputy prosecutor's statements as two separate categories: (1) telling the jury that they can decide both the law and the facts; and (2) a series of questions and facts that had more to do with the jury than with Dollahan. As to the first category of statements, the deputy prosecutor stated that the jury was to decide both the law and the facts—a statement the State argues is derived from the Indiana Constitution. The deputy prosecutor also told the jury that it could not disregard the law for any reason. Although a seemingly imprecise choice of words, we agree that the deputy prosecutor was attempting to instruct the jury to apply the law, not change it. Moreover, the State correctly points out that, when the deputy prosecutor submits a correct statement near an improper statement, the harm may be counteracted. *See Ryan,* 9 N.E.3d at 672 (holding that "[s]uch correct statement so distanced from an improper one cannot qualify its substance, but it may counteract its harm").

[28] The deputy prosecutor's second category of statements edges closer to improper statements. Specifically, we look at the portion of the closing argument where the deputy prosecutor argued:

> But how would you feel if this was going on in your back yard?
>
> You are all here in this courtroom right now, because you are residents of Starke County. This is your home, too. Is this something that you think should be legal? Is it something that

should be permissible? That should be allowed? And do you want your neighbors shooting across your property without you knowing it? Without you being aware; didn't get permission. Is this something you want to see happening in Starke County? If the answer to that question is no, then why? Why don't you? Is it because someone could get hurt? Is it because there's – by doing that you're creating a substantial risk of bodily injury, is that way? Do you want people shooting across your back yard? You have the right to decide both the law and the facts.

Tr. pp. 98-99. The statements above are similar to the statements made in *Ryan,* because, in both cases, the deputy prosecutor essentially argued that the jurors have an opportunity to stop unwanted conduct and made the allegations about the bigger picture of policing the jurors' neighborhoods. *See also Carter v. State,* 956 N.E.2d 167, 170 (Ind. Ct. App. 2011) (finding misconduct when the prosecutor asked the jurors to put themselves in the victim's shoes), *trans. denied.*

[29] Regardless of whether the deputy prosecutor's statements were improper, they do not rise to the level of fundamental error. The State presented independent evidence that Dollahan was guilty of criminal recklessness—the crimes to which the deputy prosecutor's statements seemingly apply. The State presented significant video evidence of two separate occasions when Dollahan shot directly at the Cunninghams' security cameras while the Cunningham family was home. The State further presented evidence of bullet holes on the tree stump where one security camera was mounted approximately 100 feet away from the Cunninghams' home. In light of this "overwhelming independent evidence," we cannot find that the comments made by the prosecutor resulted in fundamental error. *See, e.g., Hand v. State,* 863 N.E.2d 386, 395 (Ind. Ct.

App. 2007) ("Because the State presented overwhelming independent evidence that Hand was guilty of Class A misdemeanor domestic battery—an act that he does not deny—we find that any reference by the prosecutor to BWS or a cycle of violence that may have existed between Hand and Diona did not amount to fundamental error.").

[30] Moreover, the final jury instructions read to the jury included the following: "The unsworn statements or comments of counsel on either side of the case should not be considered as evidence in this case. It is your duty to determine the facts from the testimony and evidence admitted by the Court and given in your presence." Appellant's App. Vol. II p. 167. The instruction properly directed the jury that the deputy prosecutor's statements were not evidence in the case. *See Ryan,* 9 N.E.2d at 672-73 (finding that, despite the prosecutor's improper closing argument that the jury should "send the message that we're not going to allow people to do this," the error did not have such an "undeniable and substantial effect on the jury's decision that a fair trial was impossible," in part, because of the proper jury instructions pointing to what the jury may properly consider).

[31] Looking at the trial as a whole, we are not persuaded that the deputy prosecutor's closing arguments precluded Dollahan from obtaining a fair trial. Accordingly, we affirm the trial court's finding that the deputy prosecutor's statements do not constitute fundamental error.

## Conclusion

[32] The evidence is sufficient to convict Dollahan of criminal recklessness, a Level 6 felony, and invasion of privacy, a Class A misdemeanor. The deputy prosecutor's arguments in the State's closing argument do not constitute fundamental error. We affirm.

[33] Affirmed.

Crone, J., and Bradford, J., concur.