

**FILED**

Feb 12 2015, 6:47 am

**CLERK**

of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Offices
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kevin Townsend,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 12, 2015

Court of Appeals Case No.
09A02-1407-CR-464

Appeal from the Cass Superior Court

The Honorable Richard A.
Maughmer, Judge

Cause No. 09D02-0911-FA-12

**Brown, Judge.**

[1] Kevin Townsend appeals his convictions for vicarious sexual gratification as a class B felony and possession of child pornography as a class D felony. Townsend raises two issues, which we revise and restate as:

    I.    Whether the evidence is sufficient to sustain his conviction of vicarious sexual gratification;[1] and

    II.    Whether his right to compulsory process was violated when the trial court excluded a witness from testifying.

We affirm.

## *Facts and Procedural History*

[2] The facts favorable to the conviction reveal that, in December 2008, thirteen-year-old S.W. lived with her grandmother in Tennessee. During her school Christmas break that year, S.W. traveled to Logansport, Indiana, to visit her mother. The boyfriend of S.W.'s mother had a sister named Amy Spampinato, who had two on-again-off-again boyfriends, Townsend and Lawrence Gill. Townsend worked as a truck driver and drove throughout the country, and he

---

[1] Townsend does not challenge the sufficiency of the evidence for his possession of child pornography conviction.

would stay with Spampinato on the weekends when he was in town. Gill also sometimes stayed with Spampinato.

[3] S.W. met Townsend during her December visit and had seen him with Spampinato before. Earlier that spring, Spampinato threw a joint birthday party at Chuck E. Cheese's for one of her daughters and S.W. and had separate birthday cakes for each girl, and S.W.'s cake had thirteen candles on it. S.W. told Townsend during her visit in December that she was thirteen. At that time, Townsend was twenty-six years old and Spampinato was twenty-eight years old.

[4] During S.W.'s visit, Townsend became interested in S.W. and told Spampinato he wanted to have sexual contact with S.W., specifically stating that he "wanted to eat her pussy." Transcript at 177. He "repeatedly" asked that Spampinato approach S.W. to see if S.W. would have sexual contact with him. *Id.* When asked, S.W. told Spampinato that "she didn't want anything like that." *Id.* Also, while Spampinato was in the shower, Townsend asked S.W. to let him perform oral sex on her and that she should "let [him] do it now while [Spampinato] is in the shower;" S.W. refused and turned away when Townsend tried to kiss her. *Id.* at 36.

[5] On another day that December, Spampinato sent S.W. upstairs to wake Townsend, and when she did he looked up at her, reached out his arm, lifted S.W.'s shirt to expose her skin, and began rubbing her side. S.W. walked out of the room and was "scared" and "nervous," and she "didn't know what to

think." *Id.* at 40-41. S.W. told Spampinato about Townsend's advances, but "it didn't matter" to Spampinato. *Id.* at 41.

[6] On either the 28th or 29th of December 2008, S.W. and her cousin C.S., who was also visiting Logansport and had turned fourteen years old several days before Christmas, went to spend the night at Spampinato's house. Before they went, S.W. told C.S. about Townsend's advances, they discussed whether to stay with Spampinato, and they decided to go to Spampinato's because Townsend was not going to be there. After S.W. and C.S. arrived at Spampinato's house, the three drove to Dollar General to purchase garbage bags, and Spampinato received a phone call from Townsend. While they were talking, C.S. stated that she was bi-sexual, which Townsend heard. He confirmed with Spampinato what C.S. stated, and told Spampinato to "work something out." *Id.* at 180. Townsend told her specifically that he wanted her "to set up to have a threesome with the girls and to satisfy them until he got home," and to "perform sex acts on them that would make them happy so that they would stay there until he got there." *Id.* at 180-181. Townsend also told Spampinato that she "better make them happy until he got there or else" and she "better not mess this up like [she does] everything else." *Id.* at 181, 190. Townsend planned to have sex with S.W. and C.S. when he returned. *Id.* at 181.

[7] Later that evening, Spampinato, S.W., and C.S. drove to a drugstore, where Spampinato purchased vodka, and then to a grocery store, where Spampinato purchased orange juice. They returned home, went upstairs to Spampinato's

bedroom, and began mixing orange juice and vodka drinks. S.W. and C.S. both drank "[a] lot" of alcohol and became intoxicated. *Id.* at 55, 89.

[8] At one point, Spampinato gave C.S. black lingerie to try on and began taking pictures of C.S. in the lingerie with the camera on her cell phone. S.W. also tried on the lingerie, and Spampinato took pictures of her. Townsend requested that Spampinato send the pictures to his cell phone, and Spampinato did so. "[R]ight after" the photographs were taken, Townsend, who had pulled his semitrailer truck into a parking lot in Kentucky for the night, began speaking on the phone with Spampinato, and he continued to speak on the phone with Spampinato, S.W., and C.S. during the remaining events that night. *Id.* at 109. Townsend told S.W. and C.S. that he wished he could be there with them, and he told C.S. that "he wanted to eat [her] out." *Id.* at 90. While on the phone with Spampinato, Townsend told Spampinato "exactly what he wanted [her] to do" to the girls, including performing oral sex on the girls and to use a vibrator on them that Townsend had recently purchased for her. *Id.* at 190.

[9] The girls began trying on more of Spampinato's clothes, and they were "drinking and drinking, laughing, you know, just hanging out," and then things "switched up" and S.W. "ended up lying on the bed and her pants were off . . . ." *Id.* at 57-58. At one point, a pornographic video started playing on Spampinato's television. Spampinato began taking pictures of S.W.'s and C.S.'s vaginas and sent them to Townsend. Spampinato made a video on her cell phone and attempted to send it to Townsend, but he did not receive it. After the cell phone video failed to send, Townsend told Spampinato to use a

camcorder she had in her bedroom "to record what was going on so that he could see it when he got home." *Id.* at 185.

[10] Spampinato touched S.W.'s vagina and inserted her fingers into S.W.'s vagina. She also put her fingers inside C.S.'s vagina. Spampinato then retrieved a vibrator Townsend had given her days earlier and used it on C.S. by placing it in C.S.'s vagina. At one point while C.S. was speaking to Townsend on the phone, S.W. asked C.S. to hang up with Townsend and Spampinato stated: "no, he'll like that." Exhibit 2b at 4:10. Soon after, S.W. inserted the vibrator into C.S.'s vagina, and while this was occurring Spampinato was speaking to Townsend and stated: "Right now she's playing. Yea she's using my toy on [C.S.]." *Id.* at 7:05-7:15. Afterward, S.W. was speaking to Townsend on the phone and laughed and told him "I'm friggin' scared," and she told C.S. not to "record it and send it to [Townsend] because I'm talking to him right now." *Id.* at 9:00-9:15. Spampinato used the vibrator on S.W. and asked her "does it feel good," but she stopped because she was afraid she would hurt S.W. Transcript at 66. S.W. then told Spampinato "this is done," stood up, and went into the bathroom. *Id.* at 65. Spampinato then hung up the phone with Townsend and went to bed. S.W. became sick and threw up for the rest of the night, and she woke up on the floor "laying face down in some puke" the next morning. *Id.*

[11] S.W. and C.S. left Spampinato's house the next day, and Townsend returned after they had left. Townsend asked Spampinato for the camcorder and also why the girls were not there. When Spampinato told him the girls had gone back to stay with S.W.'s brother, Townsend became angry and told her that she

"didn't do something right. That is was [her] fault they weren't there." *Id.* at 191-192. Townsend then took the camcorder to the bathroom and began masturbating while he watched the video. After he finished watching the video, Townsend called Spampinato upstairs and began yelling at her for not doing "exactly what he told [her] to do" and told her that she "was a f--- up and couldn't do nothing right and he should have put a bullet in [her] head a long time ago." *Id.* at 193.

[12]     On March 6, 2009, Spampinato's other boyfriend, Gill, found the video made with the camcorder and turned it over to Logansport Police Detective Brad Miller. Detective Miller obtained a search warrant for Spampinato's residence on March 9, 2009, and during the search he located the vibrator used in the video, as well as the receipt showing its purchase on December 22, 2008, and he arrested Spampinato. About a week after Spampinato was arrested, Townsend called one of his friends, William Ryan, and told Ryan about the video and that he had "told the stupid b---- to get rid of the tape." *Id.* at 152. Townsend also stated he was concerned because S.W. could identify him.

[13]     The State filed initial charges against Townsend on November 12, 2009, and on January 24, 2011, the State filed an amended information charging Townsend with Count I, conspiracy to commit child molestation as a class A felony; Count II, conspiracy to commit sexual misconduct with a minor as a class B felony; Count III, vicarious sexual gratification as a class B felony; Count IV, conspiracy to commit child exploitation as a class C felony; Count V, possession of child pornography as a class D felony; and Count VI, child

solicitation as a class D felony. On January 26, 2011, the court commenced a jury trial at which Townsend requested a separation of witnesses, and the court granted his request and informed all in the courtroom that anyone present as a possible witness was required to wait outside the courtroom until he or she was called to testify.

[14] In its case in chief the State presented the testimony of S.W., C.S., Spampinato, Detective Miller, Gill, and Ryan, each of whom testified consistent with the foregoing. The court also admitted into evidence the video Spampinato made using the camcorder. After the State had finished calling its witnesses, Townsend requested that Ashley Jackson, who had been present in the courtroom for almost the entire trial and was sitting on "the side [of] the defendant," be added to the witness list and be permitted to testify. *Id.* at 229. The trial court denied the request because Jackson had violated the separation of witnesses order and because she was not on a witness list, stating specifically that "[t]ypically what would happen is I think I would allow you to do that after a [sic] State an opportunity to continue its---to prepare for her, you know take a recess or whatever, but I can't under this circumstance." *Id.* The court then allowed Townsend to make an offer to prove what Jackson would state if allowed to testify. Jackson testified that she was in jail with Spampinato and that, between January 23 and March 18 of 2010, Spampinato told her on more than one occasion that "in order to have her plea reduced . . . she would have to bring [Townsend] down to make herself look better." *Id.* at 231. Jackson indicated that this was the first time she had told anyone involved in the case

about this conversation. She also admitted she was attending the trial in support of Townsend. The court again denied Townsend's request to permit Jackson to testify.

[15] On January 27, 2011, the jury found Townsend guilty of Count III, vicarious sexual gratification as a Class B felony, and Count V, possession of child pornography as a class D felony, and not guilty of the remaining charges. On February 28, 2011, the court held a sentencing hearing and sentenced Townsend to concurrent sentences of ten years on Count III and eighteen months on Count V. On June 20, 2014, the court granted Townsend's verified motion for permission to file a belated notice of appeal, and this appeal ensued.

## *Discussion*

### I.

[16] The first issue is whether the evidence is sufficient to sustain Townsend's conviction of vicarious sexual gratification. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[17] Ind. Code § 35-42-4-5 governs the crime of vicarious sexual gratification and provided in part at the time of the offense as follows:

> A person eighteen (18) years of age or older who knowingly or intentionally directs, aids, induces, or causes a child under the age of sixteen (16) to:
>
> * * * * *
>
> (3) engage in deviate sexual conduct with another person;
>
> with intent to arouse or satisfy the sexual desires of a child or the older person commits vicarious sexual gratification, a Class C felony. However, the offense is a Class B felony if any child involved in the offense is less than fourteen (14) years of age . . . .

Ind. Code § 35-42-4-5(b) (Supp. 2003) (subsequently amended by Pub. L. No. 158-2013, § 441 (eff. July 1, 2014)). The State alleged, under Count III, that

> between December 24, 2008 and December 31, 2008 . . . Townsend, a person of at least eighteen (18) years of age, did knowingly or intentionally direct, aid, induce or cause S.W. (DOB 3/05/1995) a child under the age of fourteen (14) to engage in deviate sexual conduct with Amy Spampinato and C.S[.], with the intent to arouse or satisfy the sexual desires of [] Townsend or the child . . . .

Appellant's Appendix at 99. Ind. Code § 35-31.5-2-94 provides that "[d]eviate sexual conduct means an act involving: (1) a sex organ of one (1) person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." Thus, to convict Townsend of vicarious sexual conduct as a class B felony, the State needed to prove that he knowingly or intentionally directed, aided, induced, or caused S.W. to engage in deviate sexual conduct with Spampinato or C.S. with the intent to arouse either his or S.W.'s sexual desires.

[18] Townsend argues that that State did not present evidence that S.W. engaged in deviate sexual conduct, asserting that "[t]here was no evidence of oral sex or actual penetration of S.W. by an object." Appellant's Brief at 12. He maintains that assuming S.W. did engage in deviate sexual conduct, "Townsend's conduct was not the cause of S.W.'s deviate acts." *Id.* He argues specifically that if his "conduct caused S.W. to engage in deviate sexual conduct, he committed the crime; if someone else's conduct causes the sexual acts, he is not guilty," and cites to *Micinski v. State*, 487 N.E.2d 150, 154 (Ind. 1986), which concerned a driver under the influence of alcohol who left the scene of an accident resulting in bodily injury. *Id.* He asserts that "Spampinato directed and caused the sexual activity on the evening of December 29, 2008 – not [him]," and that although he "may have listened to Spampinato, S.W., and C.S. engage in sexual acts by phone, [] listening to sexual acts with an unfulfilled desire to participate is not the same as 'directing, aiding, inducing, or causing' sexual acts." *Id.* at 12-13. Townsend also argues that "there was no evidence that [he] actually knew that S.W. was personally engaging in deviate sexual acts rather than just observing the sex acts of C.S. and Spampinato." *Id.* at 13. He further asserts that the rule of lenity compels this court to construe Ind. Code § 35-42-4-5(b)(3) against the State, and that Spampinato's testimony is incredibly dubious.

[19] The State argues that "[a] finger is within the meaning of 'an object' for the purposes of deviate sexual conduct." Appellee's Brief at 14 (citing *Harwood v. State*, 555 N.E.2d 513, 515 (Ind. Ct. App. 1990), *aff'd*, 582 N.E.2d 359 (Ind.

1991), *reh'g denied*). The State asserts that Spampinato's testimony is not incredibly dubious, noting that it was corroborated by both S.W. and C.S., as well as the video which was admitted at trial. The State asserts that to the extent Townsend suggests "he was not the cause of S.W.'s deviate sexual conduct because he was not present when the conduct took place," he "was convicted of *vicarious* sexual gratification" and "did not need to personally participate or even be present . . . to be guilty of directing, aiding, inducing, or causing it to happen." *Id.* at 15. The State also argues that, as the video recording demonstrates, "Townsend talked with S.W. on the phone several times during the night" and that his suggestion on appeal that he did not know that S.W. engaged in deviate sexual conduct is an invitation for this court to reweigh the evidence. *Id.* at 16.

[20] To the extent Townsend asserts that the incredible dubiosity rule requires reversal of his convictions, we note that the rule applies only in very narrow circumstances. *See Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). The rule is expressed as follows:

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

*Id.*

[21] Townsend suggests that Spampinato "gave conflicting answers on whether Townsend knew the ages [sic] of S.W." between her prior statement and her testimony at trial and that her testimony is incredibly dubious because her testimony was the result of a negotiated plea. Such arguments, however, are issues of witness credibility. The function of weighing witness credibility lies with the trier of fact, not this court. *Whited v. State*, 645 N.E.2d 1138, 1141 (Ind. Ct. App. 1995). We cannot reweigh the evidence or judge the credibility of the witnesses. *See Jordan*, 656 N.E.2d at 817. We also observe that in addition to the testimony of Spampinato, the State presented the testimony of S.W. and C.S., as well as the testimony of Spampinato's ex-boyfriend Lawrence Gill, Townsend's friend William Ryan, and Detective Miller. Further, the State admitted into evidence a video depicting the sexual acts and testimony that Townsend was on the phone while such acts occurred. During his testimony, Townsend did not deny that he was on the phone during the filming of the video. We cannot say that the incredible dubiosity rule applies to his case.

[22] Moreover, the State presented evidence that Townsend, after overhearing on the phone that C.S. was bi-sexual, told Spampinato to "work something out," specifically directing her "to set up to have a threesome with the girls and to satisfy them until he got home," and to "perform sex acts on them that would make them happy so that they would stay there until he got there." Transcript at 180-181. He specifically ordered Spampinato to do what she could to keep the girls at her house "or else," and he spoke with both S.W. and C.S. while the sexual acts were occurring. *Id.* at 181. Townsend told S.W. that he wished he

could be there with them, and he told Spampinato "exactly what he wanted [her] to do" to the girls, including performing oral sex on the girls and to use the vibrator he had recently purchased for her on them. *Id.* at 190.

[23] Also, the video admitted into evidence demonstrates that while S.W. was engaging in deviate sexual conduct by placing the vibrator in C.S.'s vagina, Townsend was speaking with Spampinato and heard what was transpiring in the bedroom. Afterward, S.W. was speaking to Townsend on the phone and laughed and told him "I'm friggin' scared." Exhibit 2b at 9:00-9:05. The next day, Townsend returned to Spampinato's house, retrieved the camcorder, and took it into the bathroom to view the video while masturbating. Based upon the record, we conclude that the inferences made by the jury that Townsend knowingly or intentionally directed, aided, induced, or caused S.W. to engage in deviate sexual conduct with Spampinato or C.S. with the intent to arouse either his or S.W.'s sexual desires were not unreasonable and that evidence of probative value exists from which the jury could have found beyond a reasonable doubt that Townsend committed vicarious sexual gratification.

II.

[24] The next issue is whether Townsend's right to compulsory process was violated when the trial court excluded a witness from testifying. The Sixth Amendment to the United States Constitution "guarantees a defendant the right to present witnesses on his behalf." *Farris v. State*, 818 N.E.2d 63, 69 (Ind. Ct. App. 2004), *trans. denied*. However, "while the right to present witnesses is of the utmost

importance, it is not absolute." *Id.* (quoting *Roach v. State*, 695 N.E.2d 934, 939 (Ind. 1998), *aff'd on reh'g*, 711 N.E.2d 1237 (Ind. 1999)). Trial courts "have the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State." *Id.* (quoting *Williams v. State*, 714 N.E.2d 644, 651 (Ind. 1999), *cert. denied*, 528 U.S. 1170, 120 S. Ct. 1195 (2000)). In light "of a defendant's right to compulsory process under the federal and state constitutions, there is a strong presumption to allow the testimony of even late-disclosed witnesses." *Id.*

[25] Townsend argues that "Jackson's testimony was exculpatory, unique, and critical to the case." Appellant's Brief at 15. The State asserts that the issue is "more aptly considered as the trial court ruling on its separation-of-witnesses order" and that such determinations are "wholly within the discretion of the trial court." Appellee's Brief at 17 (citing *Myers v. State*, 887 N.E.2d 170, 190 (Ind. Ct. App. 2008), *reh'g denied*, *trans. denied*). The State argues that "[b]ecause there is no meaningful way to measure the harmfulness of the education[al] value to a witness who sits through the other witnesses' testimony before taking the stand, prejudice is presumed when a violation of a separation-of-witnesses order occurs . . . ." *Id.* at 17-18 (quoting *Myers*, 887 N.E.2d at 190). The State contends that Townsend cannot overcome the presumption here where Jackson "only decided to approach the defense to say she was willing to testify after being present for nearly the entire trial." *Id.* at 18. The State also argues that, "even if analyzed as an issue of compulsory process, the trial court did not arbitrarily deny Townsend's request," and notes that the court took

reasonable steps to decide whether to allow Jackson to testify by allowing Townsend to make an offer to prove. *Id.* The State further argues that Jackson's testimony was not material to Townsend's defense and would not have created reasonable doubt, noting specifically that the jury knew that Spampinato had received a plea deal in return for her testimony at Townsend's trial and that Jackson was not a credible witness. The State finally suggests that any error by the court in excluding Jackson's testimony was harmless, noting that the State presented multiple witnesses and a video of the events.

[26] In *Farris*, on the last day of trial defendant Farris sought to have Floyd Meeks, who had not been listed on either party's witness list, testify. 818 N.E.2d at 68. Meeks had been listed in the charging information as a material witness. *Id.* He also had been present in the courtroom throughout the trial to that point. *Id.* "The State objected to Meeks testifying, arguing that his testimony was irrelevant and that it would violate the separation of witnesses order that had been in place since the beginning of the trial." *Id.* Farris made an offer to prove in which Farris's counsel stated that she had learned that individuals in the courtroom had overheard Meeks making previously-unknown statements which were material to Farris's defense. *Id.* The court refused to allow Meeks to testify both because he had not been on Farris's witness list and he had been present during the trial while a separation of witnesses order was in effect. *Id.* at 68-69.

[27] This court concluded that the trial court abused its discretion on both grounds. First, regarding the court's ruling to exclude Meeks's testimony for failure to list

him as a witness, this court noted that "[t]here was no evidence presented at trial that Farris' counsel had acted in bad faith" and that counsel "indicated that she had called Meeks but had been unable to find him." *Id.* at 69. The court also observed that Meeks's testimony would not have substantially prejudiced the State and that indeed the State had named Meeks as a material witness in its charging information. *Id.* We noted: "Even if Meeks' testimony had prejudiced the State in some way, a continuance, rather than exclusion, would have been the appropriate remedy." *Id.* Regarding the separation of witnesses order, the court noted long-standing Indiana Supreme Court precedent that it is "an abuse of discretion to refuse to permit the testimony of a witness due to a violation of a separation of witnesses order if the party seeking to call the witness is without fault in the violation." *Id.* (quoting *Jiosa v. State*, 755 N.E.2d 605, 607 (Ind. 2001)). The court held that the violation was not Farris's fault because Meeks was not listed as a witness and that Farris's counsel had been unable to locate Meeks and did not know what he looked like, and that accordingly the trial court abused its discretion. *Id.* The State also argued that Meeks's testimony was irrelevant, but this court disagreed and concluded that relevancy would not have been a proper ground for excluding Meeks from testifying. *Id.*

[28] Here, similarly, we find that the court abused its discretion when it excluded Jackson's testimony. After Townsend asked that Jackson be allowed to testify, the court denied his request, ruling that "[t]ypically what would happen is I think I would allow you to do that after a [sic] State an opportunity to continue

its---to prepare for her, you know take a recess or whatever, but I can't under this circumstance." Transcript at 229. Just as in *Farris*, Jackson was not listed as a witness. Also, the level of fault on the part of Townsend's counsel is even less here where Townsend's counsel was not aware of the testimony Jackson could provide until that day. The record reveals that the separation of witnesses violation was the reason the court did not allow Jackson to testify and offered the State a continuance beforehand, and it did not make a finding of bad faith or substantial prejudice to the State. To the extent the State argues that Jackson's testimony would not have been "material to the defense," Appellee's Brief at 19, we note that her testimony would have challenged the credibility of Spampinato and was thus relevant. Although Jackson's testimony may have been of questionable credibility, it does not appear that the court excluded her testimony because its prejudicial impact outweighed its probative value. We therefore conclude it was an abuse of the court's discretion to exclude Jackson's testimony.

[29] This does not end our analysis, however. "[W]e will find an error in the exclusion of evidence harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights." *Farris*, 818 N.E.2d at 70 (quoting *Williams*, 714 N.E.2d at 652). We find that the trial court's exclusion of Jackson was harmless. Even assuming that the jury would have considered Jackson a credible witness, which is questionable in light of her impeachable criminal history and the fact that she was hardly an objective witness, at the trial

Spampinato testified that she had taken a plea agreement and was being housed in the Department of Correction. She indicated that as part of the plea agreement she had "to come in here and testify in this case" and that she was telling the truth at the trial. Transcript at 215. Also, as noted, the video admitted into evidence depicted S.W. engaging in deviate sexual conduct by inserting the vibrator in C.S.'s vagina, and while S.W. was doing so Spampinato was speaking with Townsend and stated: "Right now she's playing. Yea she's using my toy on [C.S.]." Exhibit 2b at 7:05-7:15. The prosecutor in her closing argument specifically pointed to this conduct when she argued that the jury should convict Townsend for vicarious sexual gratification, stating:

> [W]hen you are watching and you listen very carefully you can see how not only is the phone being passed around but people are talking. . . . [T]hey are talking back and forth not only to each other but to [Townsend] on the phone. . . . [T]here is a portion of the tape where [Spampinato] is on the phone. [S.W.] is using the vibrator on [C.S.] and [Spampinato] is describing to [Townsend] on the phone that [C.S.] and [S.W.] are playing with her toy. She called it a toy at that point and that there are a number of comments at that point that are being made to [Townsend] about the fact that [S.W.] is using---what [S.W.] and [C.S.] are doing at this time and you can also hear in the tape and in the video people are directing other people what to do. The whole time [Townsend] is on the phone and I believe based on the evidence that you've seen you can infer that he was a big part of this directing, aiding, inducing, or causing these events to happen.

Transcript at 320-321.

[30] While the trial court abused its discretion by excluding Jackson from testifying, this error was harmless. *See Farris*, 818 N.E.2d at 70 (holding that although the

trial court abused its discretion in excluding Meeks from testifying, such error was harmless because the evidence presented against the defendant was strong, and the accounts were supported by a surveillance video).

## *Conclusion*

[31] For the foregoing reasons, we affirm Townsend's convictions for vicarious sexual gratification as a class B felony and possession of child pornography as a class D felony.

[32] Affirmed.

Bailey, J., and Robb, J., concur.