## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 03 2019, 8:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark K. Leeman
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Zachary Gearring,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 3, 2019

Court of Appeals Case No.
19A-CR-280

Appeal from the Cass Superior Court

The Honorable Richard A. Maughmer, Judge

Trial Court Cause No.
09D02-1802-F5-11

**Tavitas, Judge.**

## Case Summary

Zachary Gearring appeals his conviction for battery resulting in bodily injury to a public safety officer, a Level 5 felony. We affirm.[1]

## Issues

Gearring raises three issues on appeal, which we restate as follows:

    I.    Whether Gearring knowingly and voluntarily waived his right to counsel.

    II.    Whether Gearring was denied his Sixth Amendment right to present witnesses in his defense.

    III.    Whether the evidence was sufficient to support Gearring's battery conviction.

## Facts

On February 9, 2018, Officer Zachary Griffith and Officer Flaude Dillon with the Logansport Police Department were dispatched to a possible overdose. The officers found Gearring unconscious and unresponsive on the kitchen floor. Others present included a "hysterical" Nakoah Langdon and another woman. Tr. Vol. II p. 96. After observing Gearring, officers believed Gearring overdosed due to Gearring's "pinpoint pupils [and] shallow breathing." *Id.* at 68. The officers also noticed Gearring had a black eye and blood in his nose.

---

[1] Oral argument was held in this matter on September 5, 2019, at Crown Point High School. We thank counsel for their presentations and Crown Point High School for its hospitality.

Officer Griffith and Officer Dillon were informed by Langdon that Langdon was not with Gearring prior to discovering Gearring unconscious; however, Langdon stated that Gearring possibly consumed methamphetamine and marijuana. Langdon also indicated that Gearring has a medical history of seizures.[2]

[4]     Officer Dillon, who is also an EMT, administered Narcan to Gearring. Gearring did not immediately respond to the Narcan. Shortly thereafter, medics arrived, and Gearring was placed inside the ambulance where he began to gain consciousness. Gearring was very resistant and "lung[ed] at people," including lunging at Officer Griffith while Gearring was handcuffed to the siderails on the gurney. *Id.* at 64. While in the ambulance, Gearring was "cursing[] [and] yelling profanities." *Id.* As Gearring was taken inside the hospital, Gearring continued to yell and scream and was "making animal noises." *Id.* at 65. Gearring was yelling both profanities and "incoherent babbles." *Id.*

[5]     Alex Donathen, a Cass County paramedic, testified that, when he arrived on the scene, Gearring was handcuffed to his belt. Donathen observed that

_____

[2] At oral argument, there was some discussion regarding statements Langdon made to officers regarding Gearring's physical state when officers first arrived on the scene. Gearring cross-examined Officer Dillon, and during cross examination, Officer Dillon stated that he was told by Langdon that Gearring "possible [sic] had consumed methamphetamine and marijuana." Tr. Vol. II p. 105. Gearring then asked Officer Dillon follow up questions, including whether Langdon reported that Gearring "is not high. He has seizures," to which Officer Dillon responded "Correct." *Id.* After further questioning, Officer Dillon stated that, despite Langdon's statement that Gearring "has seizures," the "symptoms [Gearring's] body was showing was [sic] not [consistent with] a seizure state." *Id.* at 106.

Gearring was becoming combative, which can be common for those suffering from an overdose. Donathen also testified: "[o]fficers on-scene had already given Narcan and it's not uncommon when you give Narcan, patients come up swinging. They're upset, they're disoriented, they don't know exactly what's going on around them a lot of times." *Id.* at 76. Donathen also indicated that Gearring tried to "head-butt" Donathen and his partner, but Gearring was unable to due to the restraints. *Id.* at 77. Gearring did, however, rip out the intravenous device ("IV") that emergency personnel placed in his arm.

[6] Gearring was wheeled into the emergency room and handcuffed to a hospital bed, and officers remained outside Gearring's hospital room as Gearring began receiving treatment. Gearring was being treated in the room with paramedic Bob Zimmerman and nurse Marie Nichols. While in the room, Zimmerman observed Gearring "reach[] up and, and take[] a hold of [Nichols'] arm and beg[in] to twist her arm." *Id.* at 136. Nichols testified that it "felt like [her] wrist was going to snap." *Id.* at 173.

[7] Officer Griffith, Officer Dillon, and Donathen heard Nichols yell, and they went into Gearring's hospital room. There, they observed Gearring holding onto Nichols' arm, and Nichols appeared to be in pain, so officers began to restrain Gearring. Officers restrained Gearring so he could be catheterized to provide a urine sample. Officer Griffith restrained Gearring by holding Gearring's legs down.

[8] Gearring's urine tests came back negative for all substances; however, Gearring's blood was later drawn and tested positive for methamphetamine. Before Nichols left her shift, approximately two hours after Gearring was admitted, Gearring apologized to Nichols and requested she not file any charges against him.

[9] On February 12, 2018, the State charged Gearring with Count I, battery resulting in bodily injury to a public safety officer, a Level 5 felony; and Count II, resisting law enforcement, a level 6 felony. On April 5, 2018, public defender, Bryan Coulter, filed a motion to withdraw his appearance due to a conflict of interest.[3] The same day, public defender, Jay Hirschauer, filed an appearance on Gearring's behalf. On June 18, 2018, Gearring sent the trial court a letter requesting termination of his court-appointed legal counsel.

[10] At the pretrial conference on November 5, 2018, Gearring's counsel informed the trial court that Gearring "want[ed] to defend himself." Tr. Vol. II p. 24. The trial court then asked Gearring directly if he wanted to "go through the process of defending [himself]" to which Gearring replied, "Yeah. That, that's fine." *Id.* Gearring was then placed under oath, and the trial court asked Gearring a series of questions including: his age; whether he was under the influence of any drugs or alcohol; if Gearring had been to law school; how much school Gearring had attended; how much experience Gearring had with

---

[3] The motion to withdraw indicates that Coulter previously prosecuted Gearring and filed charges in a case for which Gearring was serving probation at the time of the instant offense.

the criminal justice system; whether Gearring could read and write; and if Gearring understood his rights to a speedy trial, as well as his rights: to trial by jury, to compel evidence, to present witnesses, to have an attorney represent him, against self-incrimination, to appeal, and the State's burden of proof. The trial court then engaged with Gearring in a long exchange as follows:

> THE COURT: Do you understand you have the right to be defended in this case by an attorney?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And you understand you have the right to choose the attorney that you want to defend you if you can afford him?
>
> THE DEFENDANT: That's the intent. Yes, sir.
>
> * * * * *
>
> THE COURT: You are going to hire your own attorney?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you understand by hiring an attorney and having a jury trial on the 28th of November you're probably putting yourself in a situation where your attorney's not going to be ready to go but the Prosecutor's going to go ahead and pursue the case?
>
> THE DEFENDANT: Yes, sir.

THE COURT:  Okay.  And you understand that may put you in legal jeopardy?

THE DEFENDANT:  I can't see me being in any worse situation that [sic] I'm in now.

THE COURT:  So, what you're telling me right now, however, is is [sic] that you're going to retain an attorney to represent you?

THE DEFENDANT:  Yes, sir.

THE COURT:  You understand if you cannot afford an attorney the Court would appoint one for you?

THE DEFENDANT:  Yes, sir.

THE COURT:  You understand . . . you have a right to an attorney provided by the Court even if you're found guilty of the offense charged?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Where you [sic] going to get the money to hire a lawyer?

THE DEFENDANT:  My family.

* * * * *

THE COURT:  Do you understand that if you decide to represent yourself in this cause of action, you're not going to get

any special treatment, or I'm not going to hold your hand through the process? I'm going to treat you both equally.

THE DEFENDANT: Yes, sir.

THE COURT: And you understand that that [sic] fellow that's going to prosecute the case has been to law school?

THE DEFENDANT: Yes, sir.

THE COURT: And he's going to beat your brains out with the rules and procedures that you don't know?

THE DEFENDANT: Yes, I understand.

THE COURT: And you're willing to throw yourself in, on that gauntlet?

* * * * *

THE DEFENDANT: -- well, it's not going to be me. It's going to be a hired attorney.

THE COURT: You're going to get an attorney? Okay.

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand if you don't hire an attorney, however, I'm preparing for that opportunity, that if you don't hire an attorney, that they're going to go ahead and proceed with trial without you being represented by a lawyer?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And you're willing to accept that risk?

THE DEFENDANT: Unfortunately, I am.

* * * * *

THE COURT: Okay. So you're telling me now on the record you do not want to be defended by an attorney in this case?

THE DEFENDANT: For the time being, no.

THE COURT: Okay. All right. Show he waived his right to counsel. . . .

*Id.* at 27-30.

[11] Gearring's jury trial began on November 28, 2018; Gearring appeared pro se. When the trial court asked Gearring to review the preliminary jury instructions, Gearring and the trial court had the following exchange:

THE DEFENDANT: As I'm sure you know I'm fairly new to this. This is pretty much winging it at this point to be honest.

THE COURT: Well, you told me you didn't want Mr. Hirschauer to represent you under oath. Yes?

THE DEFENDANT: Yes, sir.

THE COURT: And you told me that you were going to either represent yourself or hire an attorney. Correct?

THE DEFENDANT: Yes. The intent was to hire an attorney but, obviously, I was just bonded out recently in the last two weeks or so –

THE COURT: Okay. You paid $2,000.00 cash you could've used for an attorney.

THE DEFENDANT: Well, it was more for a medical issue than paying for an attorney. I had medical issues that the jail couldn't accommodate.

THE COURT: Okay.

*Id.* at 34-35.

[12] At the jury trial, witnesses testified to the foregoing facts. Donathen indicated that, based on his experience, Gearring's behavior was not consistent with a seizure and was instead consistent with a "combative patient who lost [his] high."[4] *Id.* at 82. Donathen also indicated that, when test results show a substance in a person's blood and not their urine, the results indicate that the substance "has not been fully processed in the body." *Id.* at 83. Donathen also indicated, because methamphetamine is not an opiate, Narcan would not reverse the effects of methamphetamine; however, officers moving someone

---

[4] Officer Dillon and Zimmerman similarly testified that, in their experience, Gearring's behavior was not consistent with a seizure.

and causing them to wake while on methamphetamine may result in similar anger.

[13] After the trial commenced, outside the presence of the jury, the State indicated that it was advised the day of the trial that Gearring intended to present testimony of two witnesses, Pierre Hawkins and Karen Cooper, in his defense. The State indicated that the State was able to take brief statements from the witnesses, but that the witnesses' testimony would not be relevant. The State orally moved to exclude the witnesses' testimony.[5] The State argued:

> [Hawkins], I believe would be testifying to, to incidents of dates of which he is unable to verify or relate in which he witnessed what he believes to be a seizure. He cannot place them in time in relation to the case. He also has no medical training to diagnose a seizure. So, his diagnosis, such as it is, is based on hearsay, not on medical training. . . . [H]e would also add some character testimony which is, does not comport with the requirements of 402. [Cooper] would testify as well to her knowledge of seizures, of the Defendant having seizures, but cannot relate them in time to this case. She also apparently was a bartender at the Corner Pub and remembers an occasion in which Officer Dillon came in and was intoxicated and the Defendant feels that's relevant somehow. It's obviously not and I'm moving that that be excluded as well.

---

[5] The deputy prosecutor indicated that Hawkins described an incident during which Gearring was having a seizure; he was shaking, breathing heavily, got a bloody nose, and Gearring's words were "discombobulated." Tr. Vol. II p. 124.

Tr. Vol. II p. 122. The trial court asked Gearring questions regarding the two witnesses, and Gearring indicated that Cooper and Hawkins both have seen Gearring seize; however, they were not present the evening of the incident. Moreover, the prosecutor indicated that Hawkins does not appear to have any medical training, aside from a CPR certification. Cooper is a cardiac tech in Illinois; however, according to the State's representation of their discussion with Cooper, Cooper's training did not include diagnosis of seizures. Gearring also acknowledged that he did not inform the State of the witnesses until after the trial began.

[14] The trial court granted the State's oral motion in limine to exclude the witness testimony because their testimony is "not relevant to the issue before the jury at this time." *Id.* at 127. The trial court then asked if Gearring "wish[ed] to make any record in that regard or an offer to prove" to which Gearring responded, "[n]o." *Id.*

[15] When the jury notified the trial court that a verdict had been reached, the trial court contacted Gearring by phone, but Gearring did not appear in court when the verdict was rendered. The trial court issued a warrant for Gearring's arrest. The jury found Gearring guilty of both Count I and Count II, which the trial court merged. The trial court sentenced Gearring on Count I to 1,460 days executed at the Department of Correction.

## Analysis

### I.    *Right to Counsel*

[16]    Gearring first contends that he did not knowingly or intelligently waive his right to counsel because he was not advised of the "dangers and disadvantages of self-representation." Appellant's Br. p. 19. "The Sixth Amendment to the U.S. Constitution and Article 1, [S]ection 13 of the Indiana Constitution guarantee a criminal defendant the right to appointed counsel." *Jones v. State*, 783 N.E.2d 1132, 1138 (Ind. 2003). "Accordingly, when a criminal defendant waives his right to counsel and elects to proceed *pro se,* we must decide whether the trial court properly determined that the defendant's waiver was knowing, intelligent, and voluntary." *Id.* "Waiver of assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.*

[17]    "It is well established that there is a strong presumption against the waiver of the right to counsel, and it is the *trial court* that bears the 'serious and weighty responsibility to determine whether there was an intelligent and competent waiver.'" *Wirthlin v. State,* 99 N.E.3d 699, 704 (Ind. Ct. App. 2018) (quoting *Eaton v. State,* 894 N.E.2d 213, 217 (Ind. Ct. App. 2008)) (emphasis supplied), *trans. denied.* "'When a defendant asserts the right to self-representation, the court should tell the defendant of the dangers and disadvantages of self-representation.'" *Wirthlin,* 99 N.E.3d at 705 (quoting *Poynter v. State,* 749 N.E.2d 1122, 1126 (Ind. 2001)). "Although a trial court need not follow specific talking points when advising a defendant of the dangers and

disadvantages of proceeding without counsel, a trial court must come to a considered determination that the defendant is making a knowing, voluntary, and intelligent waiver of his right to counsel." *Id.* (internal quotations omitted).

[18]         To determine whether a knowing, voluntary, and intelligent waiver has occurred, an appellate court considers these four factors: (1) the extent of the trial court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed pro se. A lack of any advisement regarding the dangers and disadvantages of self-representation weighs heavily against finding a knowing and intelligent waiver. The importance of the right to counsel cautions that trial courts should at a minimum reasonably inform such defendants of the dangers and disadvantages of proceeding without counsel.

*Id.* (internal quotations omitted).

[19] Gearring specifically argues that, even though there was some colloquy with the trial court on self-representation: (1) the colloquy occurred a few weeks before trial; (2) the colloquy occurred while Gearring was still incarcerated; (3) the trial court said "nearly nothing" about the dangers and disadvantages of self-representation; and (4) the trial court did not renew his questions regarding self-representation after it appeared Gearring sought to hire private counsel, but was unable to do so. Appellant's Br. p. 19.

[20] In *Houston v. State,* 553 N.E.2d 117, 118 (Ind. 1990), our Supreme Court held that the trial court did not err in allowing Houston to represent himself at trial

after Houston repeatedly refused to cooperate with counsel and failed to "retain private counsel [which] enabled him to frustrate the judicial process and avoid being brought to trial." *Houston,* 553 N.E.2d at 118. Houston was "adequately warned" that if he did not employ private counsel he would represent himself with only advisory counsel. *Id.* Still, Houston later again refused court-appointed counsel, and our Supreme Court held that it "must assume that appellant elected to waive his right to counsel and proceed *pro se.*" *Id.*

[21] Although we acknowledge the factual difference between this case and *Houston*—namely, that there is no evidence Gearring was uncooperative with counsel—the same result is required here. Gearring acknowledged more than once that he planned to hire private counsel; however, he was warned by the trial court that there may be an occasion which Gearring is unable to hire counsel and that Gearring would be required to continue pro se. Gearring stated he understood the trial court's statement that: "if you don't hire an attorney, however, I'm preparing for that opportunity, that if you don't hire an attorney, that they're going to go ahead and proceed with trial without you being represented by a lawyer." Tr. Vol. II pp. 29-30. *See Houston,* 553 N.E.2d at 118 ("Appellant was adequately warned by the trial court that if he chose not to employ private counsel, he would represent himself and would be given advisory counsel. Because appellant did not retain private counsel, he must have elected to proceed with advisory counsel only.").

[22] Based on the record before us, Gearring has not proved that his waiver of counsel was not knowingly and voluntary.

## II.    *Presentation of Witnesses*

Second, Gearring argues that he was unable to present witnesses, which violated his Sixth Amendment rights.[6]  As discussed above, Gearring sought to present two witnesses who would testify regarding Gearring's history of seizures and his typical conduct during seizures in support of Gearring's defense that he was not intoxicated but, instead, suffered a seizure.  By all accounts, these witnesses were lay witnesses because, as discussed above, while one of the witnesses may have had some medical experience, they were not introduced as expert witnesses.

Gearring argues that he was denied the right to present witnesses in violation of his Sixth Amendment rights.  "The Sixth Amendment to the United States Constitution 'guarantees a defendant the right to present witnesses on his behalf.'" *Townsend v. State,* 26 N.E.3d 619, 627 (Ind. Ct. App. 2015) (quoting *Farris v. State,* 818 N.E.2d 63, 69 (Ind. Ct. App. 2004), *trans denied*), *trans. denied.* "[W]hile the right to present witnesses is of the utmost importance, it is not absolute." *Id.*  Trial courts "have the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State." *Id.*  In light "of a defendant's right to

---

[6] The State argues that Gearring waived this argument because Gearring did not attempt to introduce the witnesses during his presentation of the evidence and because Gearring declined the trial court's opportunity to make an offer of proof regarding the witnesses.  There appears to be adequate information in the record regarding what the witnesses would have stated during their testimony; therefore, we will address Appellant's arguments on their merits.

compulsory process under the federal and state constitutions, there is a strong presumption to allow the testimony of even late-disclosed witnesses." *Id.*

[25] "'The trial court has wide latitude in ruling on the admissibility of evidence in determining its relevancy.'" *Williams v. State,* 749 N.E.2d 1139, 1142 (Ind. 2001) (quoting *Kremer v. State,* 514 N.E.2d 1068, 1073 (Ind. 1987)). "We review a trial court's ruling as to relevance for an abuse of discretion." *Williams,* 749 N.E.2d at 1142. "And even if the trial court erroneously excludes admissible evidence, we will not reverse a defendant's conviction unless his substantial rights have been affected." *Id.* When, however, there is an issue of constitutional law, we review those claims *de novo. Brittain v. State,* 68 N.E.3d 611, 617 (Ind. Ct. App. 2017), *trans. denied.*

[26] Gearring argues, because his witnesses were excluded, he had no evidence to support his theory of the case that he was suffering from a seizure and did not knowingly or intentionally batter Nichols. The only evidence in the record of what these witnesses would have testified to is the State's characterization of the testimony based on the State's brief conversation with the proffered witnesses. Gearring's witnesses would have testified to the physical characteristics they observed with previously seeing Gearring seize, which Gearring would have argued was similar to the way officers and paramedics described Gearring that evening. Gearring's witnesses, according to Gearring,

would not have been able "to remember exact dates."[7] Tr. Vol. II p. 123. Moreover, the two witnesses were not with Gearring the night of February 9, 2018, when the underlying events occurred.

[27] Accordingly, these lay witnesses would only be able to testify to what Gearring looked like during and after his previous seizures at some undetermined time in the past. These witnesses would not have been able to testify that Gearring was seizing the night of the offense, however, because the witnesses were not present that evening.[8] Under these circumstances, we cannot say the trial court's exclusion of this evidence constituted a violation of Gearring's constitutional rights.

### III. *Sufficient Evidence*

[28] Finally, Gearring argues the evidence was insufficient regarding the intent element of the battery. When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985), *cert. denied*). Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn

---

[7] Gearring notes that he was "incarcerated for the last nine months," and that he had only been out of jail for two weeks, and the prosecutor stated the timeline was "at least nine months prior [to Gearring's prior incarceration]," but there was no other indication of when the witnesses saw Gearring seize. Tr. Vol. II p. 123.

[8] Importantly, Officer Dillon, Nichols, Zimmerman, and Donathen, all of whom were present that evening, testified that Gearring's conduct was not consistent with a seizure.

therefrom.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*.* "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). Further, "[w]e will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

[29]    The charging information for Count I alleges that Gearring "on or about February 9, 2018, . . . did knowingly or intentionally touch [Marie] Nichols, a public safety officer, in a rude, insolent, or angry manner by grabbing her left upper arm" contrary to Indiana Code Sections 35-42-2-1(c)(1) and 35-42-2-1 (g)(5)(A). Indiana Code Section 35-42-2-1(c)(1) states that a person commits battery if the defendant knowingly or intentionally "touches another person in a rude, insolent, or angry manner." The offense becomes a Level 5 felony, if the offense is committed against "[a] public safety official while the official is engaged in the official's official duties." Ind. Code § 35-42-2-1(g)(5)(A).

[30]    The trial court instructed the jury on voluntary intoxication. The instruction stated:

>        Voluntary intoxication is not a defense to the charge of Battery Resulting in Bodily Injury to a Public Safety Officer or Resisting

Law Enforcement. You may not take voluntary intoxication into consideration in determining whether the Defendant acted intentionally, knowingly or recklessly as alleged in the information.

Appellant's App. Vol. II p. 201. *See* Ind. Code § 35-41-2-5 ("Intoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense unless the defendant meets the requirements of IC 35-41-3-5."). Moreover, Indiana Code Section 35-41-3-5 states:

It is a defense that the person who engaged in the prohibited conduct did so while he was intoxicated, only if the intoxication resulted from the introduction of a substance into his body:

(1) Without his consent; or

(2) When he did not know that the substance might cause intoxication.

[31] Gearring argues that voluntary intoxication was the State's theory of mens rea and that it was the State's burden to prove voluntary intoxication. The State, however, contends that the State did prove Gearring knowingly or intentionally committed the battery and that voluntary intoxication—in the form of methamphetamine ingestion—is not a defense.

[32] We do not agree with Gearring that the State's case at the trial court was predicated solely on a theory of voluntary intoxication. Specifically, on direct

examination of Zimmerman, who was present when Gearring grabbed Nichols'

arm, the following colloquy occurred:

> Q. Did something happen between the Defendant and Mr.
> Nichols, Ms. Nichols at that point?

> A. Yeah. He, the Defendant, actually had reached up and, and
> taken a hold of her arm and began to twist her arm.

> Q. You personally observed this?

> A. Yes, sir.

> Q. Did it appear, did it appear to be a volitional, intentionally
> [sic] movement?

> A. I believe so.

> Q. Did it, did it appear to be an involuntary spasm?

> A. No, sir.

Tr. Vol. II p. 136. We recognize that the State, in closing argument, argued

voluntary intoxication, and stated: "[voluntary intoxication] is important for

you to consider because unless the meth fairy came down and put it in the

Defendant's system, he was voluntarily intoxicated and I think the evidence

shows that." Tr. Vol. II p. 217. Still, our view of the record was that the State

pursued both theories—that Gearring knowingly or intentionally battered

Nichols or, in the alternative, that Gearring did so while voluntarily intoxicated.

[33] The evidence indicates that, upon arrival, a person at the home where Gearring was found indicated that Gearring had possibly consumed methamphetamine or marijuana. When officers administered Narcan, the Narcan did not work. While being transported to the ambulance, and after being placed in the ambulance, Gearring was loudly shouting profanities, shouting other statements which were unclear, making animal noises, and even ripped the IVs out of his arm. This erratic conduct continued while Gearring was at the hospital; he went back and forth between this enraged stage and a calm demeanor. When Nichols and Zimmerman were tending to Gearring in the room, he grabbed Nichols' wrist so hard that Nichols thought her wrist was going to break. Zimmerman, who was in the room when Gearring grabbed Nichols' wrist, stated that Gearring's actions appeared to be intentional, and not an involuntary spasm. Officers then grabbed Gearring and restrained him so the catheter could be placed in Gearring. After the incident, Gearring apologized and asked Nichols not to press charges.

[34] Based on the foregoing, there was sufficient evidence of the mens rea element of battery to sustain Gearring's conviction.

## Conclusion

[35] Gearring knowingly and voluntarily waived his right to counsel. Furthermore, the exclusion of Gearring's witnesses did not violate his Sixth Amendment

rights.  Finally, there was sufficient evidence to convict Gearring of battery. We affirm.

[36]   Affirmed.


Vaidik, C.J., and Mathias, J., concur.